# GEORGE McLEAN et al.

## vs.

# WILLIAM M. MALOY et al.

*Attorney and Client—Fiduciary Relations—Estoppel to Question Transaction—Sale of Corporate Stock.*

On an issue as to whether an agreement for the sale of property should be set aside by reason of the interest of the vendor's attorneys as purchasers, the sale being in terms to a corporation half of the stock in which was to be taken by them, *held* that, the corporation not being incorporated or the stock subscribed until after the execution of the agreement, and this failing to give full protection in certain particulars to the vendors, as regards the security for the agreed periodic payments to be made to the vendors by way of consideration, the agreement was originally such as would not be upheld by a court of equity.                                   p. 514

The purchasers having subsequently furnished complete security for the periodic payments, and the vendors, with full knowledge of the attorneys' interest in the purchase, having accepted such payments and induced action on the attorneys' part based on the assumption of the validity of the agreement, *held* that the agreement should be regarded as validated and ratified.                                   p. 515

One who stands by and sees another laying out money on the faith of an agreement between them, and exacts strict performance on the other's part, cannot thereafter question its validity.                                   p. 516

An agreement involving the sale of the controlling interest in the stock of a contracting company is not invalid because it provides for the payment by the company of the fees of the administrators of the previous owner of such interest, although such administrators were the attorneys of holders of minority interests, they having done work in connection with the administration which enured to the benefit of the company.                                   p. 509

*Decided June 17th, 1920.*

Appeal from the Circuit Court No. 2 of Baltimore City (DOBLER, J.).

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS and OFFUTT, JJ.

*William L. Marbury,* with whom was *Charles H. Merillat* on the brief, for the appellants.

*Joseph C. France* and *Arthur W. Machen, Jr.,* with whom were *Omer F. Hershey,* and *Hershey, Machen, Donaldson & Williams* on the brief, for the appellees.

THOMAS, J., delivered the opinion of the Court.

The late Colin McLean, of Baltimore City, was for a number of years connected with the Baltimore and Ohio Railroad Company as superintendent of construction of bridges, etc., and left that company to engage in the contracting business in New York. After repeated reverses in New York and elsewhere he returned to Baltimore in 1903. His losses had exhausted his means, and he no longer had the necessary money to carry on the contracting business, but in that year he caused to be incorporated in Baltimore City the McLean Contracting Company, with a capital stock of twenty-five thousand dollars, all of which was paid for by his wife with property she had in New York, and she gave him, or the company, thirty shares of the stock to distribute among his friends. She also gave him, or the company, some money that she had in the savings bank to pay for a dredge. By this means, and with further financial assistance from Mr. George Shriver of the Baltimore and Ohio Railroad Company, with whom he had maintained friendly relations ever since his connection with that company, and with the aid of Mr. Frank Furst, who assisted him in securing the necessary contractor's bond, the McLean Contracting Company began the contracting business in Baltimore City. For several years

the company's earnings were sufficient to afford Mr. McLean a living and to enable the company to gradually acquire a plant. While engaged in the dredging business around Baltimore, Mr. McLean discovered large deposits of sand and gravel at the bottom of the river, and in 1907 or 1908 he conceived the idea of dredging for this sand and gravel. To enable him to do so the capital stock of the McLean Contracting Company was increased to $65,000.00, and Mr. McLean again appealed to Mr. Shriver to get his friends to take the stock. This enterprise of the McLean Contracting Company was so successful that it attracted the attention of Mr. Michael Horner, who had been a friend of Mr. McLean and who decided to undertake the same business. The competition between the McLean Contracting Company and Mr. Horner became very bitter, and the cutting of prices of sand and gravel below cost was about to ruin both the company and Mr. Horner. They both appealed to their mutual friend Mr. Frank Furst, and he advised them to combine and to form a company. As the result of this advice the Arundel Sand & Gravel Company was incorpotated with the McLean Contracting Company, Mr. Furst and Mr. Horner as the principal owners of the capital stock, the McLean Company receiving for that part of its equipment employed in the sand and gravel business the stock of the Arundel Sand & Gravel Company to the amount of $45,000.00. The Arundel Sand & Gravel Company, doubtless through the business ability and financial backing of Mr. Furst, was a great success, and for several years the McLean Contracting Company received each year dividends on its stock of the Arundel Sand & Gravel Company to the amount of $22,500.00. In 1913 the Arundel Sand & Gravel Company was reorganized, and as a result of that reorganization the McLean Contracting Company received $162,000.00 in cash, preferred stock of the par value of $213,000.00 and common stock of the par value of $140,-000.00. After the McLean Contracting Company received the money and stocks referred to, Mrs. McLean and some of Mr. McLean's friends wanted him to retire from business,

but as early as 1907 Mr. McLean, who was the president of
the McLean Contracting Company, and with his wife con-
trolled that company, acting on what he supposed was reliable
inside information as to the future needs of the Baltimore
and Ohio Railroad Company, began to lease and purchase
lots and water-front properties at Locust Point with the view
of selling them to the Railroad Company. In April, 1907,
he leased from E. Glenn Perine and others, in the name of
the McLean Contracting Company, the lot designated on the
plat and known in this case as lot A, subject to an annual
ground rent of $3,898.63. In November, 1910, he leased *in
his own name* from E. Glenn Perine and others lot D, sub-
ject to an annual ground rent of $4,739.04. In June, 1911,
he leased from E. Glenn Perine and others in the name of
the Contracting Company lot B, subject to an annual ground
rent of $1,240.00, and in June, 1912, he leased from E. Glenn
Perine and others in the name of the Contracting Company
lot C, subject to an annual ground rent of $2,400.00. In
March, 1913, he leased in his own name from the Baldwin
and Myers heirs and trustees lot G, subject to an annual
ground rent of $3,900.00. In April, 1913, he purchased in
his own name lot F, for $45,000.00, $20,000.00 of which was
paid in cash, and the balance of $25,000.00 was secured by
a mortgage of the property. In August, 1913, he purchased
in his own name from the Standard Oil Company lot E, for
$42,500.00, $12,500.00 of which was paid in cash and the
balance of $30,000.00, represented by three promissory notes
of $10,000.00 each, were secured by a mortgage of the prop-
erty, and the first of said notes was paid in 1915, and in
October, 1913, he leased in his own name from the Howard
heirs lot H, subject to an annual ground rent of $5,300.00.
He also purchased in his own name, in August, 1914, for
$18,000.00 lot No. 1, a suburban property, commonly known
as the Ingram property, on Park Heights Avenue, in Balti-
more City. The dwelling on this property had been destroyed
by fire, and Mr. McLean spent about $30,000.00 in restoring

the building, and then incumbered the property by a mortgage to a building association for $24,000.00.

The money paid for the lots purchased in Mr. McLean's name, as well as that required to carry all of the lots and to pay the ground rents, taxes and interest, and for extensive improvements, was furnished by the McLean Contracting Company, and as that company had never declared any dividends, except dividends of ten per cent. each year during the several years ending in 1911, when the company received the dividends of $22,500.00 referred to from the Arundel Sand and Gravel Company, in order to meet the heavy demands upon it, it was compelled to sell by degrees all of its common stock and a part of its preferred stock of the Arundel Sand and Gravel Company, and to pledge as security for loans nearly half of its remaining preferred stock of that company. Mr. McLean made repeated efforts to sell these lots, and also placed them in the hands of a number of real estate agents for sale, without any success, and by the end of 1915 his credit and the credit of the McLean Contracting Company had become so impaired that he told his attorney that "he could not last six months longer." Another embarrassing feature of the situation in 1915 grew out of the proposed opening of McComas Street through these lots. Mr. McLean, and those who succeeded him in the management of his estate and the affairs of the Contracting Company, believed that the opening of the street would practically destroy the value of the lots, and in addition to that the Commissioners for Opening Streets had assessed the benefits to these lots at $82,000.00 more than the damages awarded. Appeals were entered from the action of the Commissioners and were pending at the time of Mr. McLean's death.

Mr. McLean died in Baltimore City, intestate, on the 29th of April, 1916, leaving a widow, Catherine McLean, a daughter by a former marriage, Josephine McLean, now Mrs. Dall, and a son, George McLean, as his only next of kin and heirs at law. Miss Josephine McLean was about thirty-six years of age at the time of Mr. McLean's death. She married when

she was about nineteen years of age and had been divorced from her husband. She had no means, and as, according to her testimony, the relations between her and her step-mother were rather "strained," she lived in Washington on an allowance of $1,200.00 a year from her father. George McLean was forty years of age at the time of Mr. McLean's death, and was married and living in the State of New York. He had been educated at Rock Hill College, at Ellicott City, Maryland, and after leaving college worked from time to time for his father when he was engaged in the contracting business, and knew of the reverses and failures of his father in that business. He had not been very successful in any business of his own, and Mr. McLean for a number of years before his death had been assisting him, but not to the same extent that he provided for his daughter.

After Mr. McLean's death, Mrs. McLean, Miss Josephine and George McLean consented to the appointment of Mr. William M. Maloy and Mr. Charles H. Knapp, both of Baltimore City, as administrators of his estate. Mr. Maloy was a member of the bar and of the firm of Maloy & Brady, composed of himself and George M. Brady, and had been counsel for Mr. McLean and the McLean Contracting Company for a number of years. Mr. Knapp was also a member of the bar, and of the firm of Knapp, Ulman & Tucker, was president of Furst Realty Company, which owned a great deal of water-front property on the opposite side of Spring Gardens, and was counsel for the Furst interests in Baltimore City, for the Maryland Dredging Company and for the Arundel Sand & Gravel Company. The theory upon which these gentlemen were selected to serve as administrators, apart from their ability and standing as attorneys, their knowledge of the properties involved and their relations with the parties interested, was that Mr. Maloy would represent the interests of the children and Mr. Knapp would represent the interest of Mrs. McLean.

An examination of the condition of Mr. McLean's estate, and of the affairs of the McLean Contracting Company, disclosed that the estate consisted of:

|  |  |
|---|---:|
| Lot D, leasehold, subject to annual ground rent of $4,739.04, redeemable at about.. | $78,984.00 |
| Lot G, leasehold, subject to an annual ground rent of $3,900.00, redeemable at. | $65,000.00 |
| Lot H, leasehold, subject to an annual ground rent of $5,300.00, redeemable at. | $88,333.33 |
| Lot E, in fee, subject to a mortgage of.... | $20,000 00 |
| Lot F, subject to a ground rent of one dollar, but really in fee, subject to a mortgage of.......................... | $25,000.00 |
| Lot 1, Park Heights Avenue property, subject to a mortgage of ................ | $22,500.00 |
| 253 shares of stock of the McLean Contracting Company, par value $100.00, at $250.00 per share .................. | $63,250.00 |
| 52 shares of preferred stock of Arundel Sand and Gravel Company, par value $100.00, at $90.00 per share........... | $4,680.00 |
| 1 share of common stock of the Arundel Sand and Gravel Company, par value $100.00, at $74.00 ................... | 74.00 |
| 1 share of the common stock of the Garrison Country Club, par value $10.00, at $1.00. ............................ | 1.00 |
| 1 share of the common stock Southern Branch Drawbridge Co. (Norfolk, Va.), par value $100.00, at $1.00........... | 1.00 |
| 2 fifty-dollar bonds Baltimore Yacht Club. | 100.00 |
| 30 shares common stock of the Baltimore Orchard Co., par value $10.00, at $1.00 | 30.00 |
| 343 shares of the common stock of the Boston Sand and Gravel Co., par value $100.00, at $5.00. ................... | 1,715.00 |
| 226 shares preferred stock of the Boston Sand and Gravel Co., par value $100.00, at $25.00. ........................ | 5,650.00 |
| Other assets valued at................. | 132.00 |

One of the mortgages was due, and among a number of other items of indebtedness of the estate were the items of $14,500.00, due Mr. George Shriver, and $12,532.76, due for taxes for the years 1914, 1915 and 1916.

In addition to the leasehold interests in lots A, B and C, subject to the annual ground rents referred to of $3,898.63, $1,240.00 and $2,400.00, the assets of the McLean Contracting Company consisted of its plant, machinery, merchandise stocks and accounts receivable, all of uncertain value, and

| | |
|---|---|
| Cash. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $10,073.87 |
| 1916 shares preferred stock of the Arundel Sand and Gravel Co., par value $100.00, at $90.00 . . . . . . . . . . . . . . . . . . . . . . . . | $172,440.00 |
| 50 shares of stock of the Boston Sand and Gravel Co. . . . . . . . . . . . . . . . . . . . . . | 1,000.00 |
| 36 fifty-dollar first mortgage bonds of the Baltimore Yacht Club . . . . . . . . . . . . . . | 1,800.00 |
| 50 shares of stock of the Frank Furst Realty Company. . . . . . . . . . . . . . . . . . . | 5,000.00 |

The company was not only indebted for accounts payable and bills payable to the amount of $55,196.43, for which about 850 shares of its preferred stock of the Arundel Sand & Gravel Company had been pledged as collateral security, but it was also indebted for taxes for the years 1914, 1915 and 1916 to the amount of $12,355.70. The capital stock of the McLean Contracting Company consisted of six hundred and fifty shares and was held as follows: Mrs. McLean, 382 shares; Mr. McLean's estate, 253 shares; Miss Joesphine McLean, 6 shares; Donald McLean, 3 shares; Robert Kennedy, 3 shares and Mr. Caghey, 3 shares. Mrs. McLean, who owned a majority of the stock, had always been very much opposed to the purchase of lots A, B, C, D, E, F, G and H, and did not share in Mr. McLean's hopes and expectations in regard to them. Moreover Mr. McLean's experience, and the experience of some of her friends in the contracting business, made her unwilling to continue that business, and

after Mr. McLean's death, prompted by her own views and the advice of relatives and friends, she was anxious to have the company liquidated. Mr. Knapp shared her views as to the value of the lots and the advisability of liquidating the company or disposing of her stock, but Mr. Maloy had more faith in the value of the lots and also felt that the continuation of the company was the only means by which he could hope to raise the money necessary to carry the lots until they could be disposed of, and that liquidation of the company would, therefore, be disastrous to his clients, Miss Joephine and George McLean. At a meeting of the stockholders of the company on May 17th, 1916, which Miss Josephine McLean attended, Mrs. McLean was elected president of the company; Mr. Maloy and Mr. Knapp were elected members of the board of directors, composed of Mrs. McLean, Miss Josephine McLean, Robert Kennedy, Donald McLean, Joseph Caghey, William M. Maloy and Charles H. Knapp, and a resolution was passed creating an executive committee composed of Mrs. McLean, Mr. Maloy, Mr. Knapp and Mr. Donald McLean, who was the nephew of Mr. Colin McLean and the general manager of the company. At that meeting there was read a statement of the condition of the company and of the McLean estate and a copy of that statement was given to Miss Josephine McLean. At a subsequent meeting of the stockholders and directors of the company it was arranged that Miss McLean, who had been receiving one hundred dollars a month from her father and who was dependent upon it for support, and George and Mrs. McLean should have an account with the company upon which they could draw while the estate was being settled. At a meeting of the directors and stockholders of the company on May 31st, a resolution was passed authorizing the company to borrow $35,000.00 and to deposit as collateral 500 shares of the Arundel Sand & Gravel Company preferred stock, $20,000.00 of which was to be loaned to the estate of Mr. McLean on the note of the distributees and to be used in paying the debts of the estate, and the balance of $15,000.00 was to be used in paying the

debts of the company. In the latter part of June or early in July Mrs. McLean and Miss Josephine and George McLean and the administrators leased lot G to the Coastwise Ship Building Company for the term of five years at an annual rent of $6,500.00, with the right to a renewal of the lease for a like term at an increased rent, and with a covenant on the part of the lessee to construct certain improvements on the lot, and subject to the right of the Baltimore and Ohio Railroad Company to purchase or condemn that portion of the lot north of the northern line of McComas Street as proposed to be opened. On the 28th of August, 1916, Mr. Maloy and Mr. Knapp succeeded in reaching an agreement with the city settling the controversy in reference to the opening of McComas Street, and also obtained an agreement with the Baltimore and Ohio Railroad Company in reference to the purchase of those parts of lots E, F, G and H situated north of the northern line of the proposed McComas Street. By these agreements, which were executed by Mrs. McLean, Miss Josephine and George McLean and by the administrators, the railroad company agreed to pay for said parts of lots E, F, G and H, in fee, so much per square foot, amounting to $56,236.96 for the part of lot H, $38,341.83 for the part of lot G, $12,249.59 for the part of lot E and $14,263.86 for the part of lot F, and the city agreed, subject to the passage of the necessary ordinance, to abandon or close that part of McComas Street east of lot H, and to purchase, in fee, that part of lot H south of the northern line of McComas Street for the sum of $82,000.00, less the sum of $20,000.00, which the McLean heirs and administrators agreed should be assessed against the remainder of lot H and lots E, F, G, D and A. As an ordinance had to be passed to carry out this agreement with the city, settlements with the city and the railroad company were not made until the following October.

Mrs. McLean, who was determined to liquidate the McLean Contracting Company or to dispose of her stock, refused to let the company take any contracts, in consequence

of which the plant was rapidly deteriorating and Mr. Knapp threatened Mr. Maloy that if he did not find some one to purchase her stock "he could not hold Mrs. McLean any longer" and they would have to liquidate. While Mr. Maloy and Mr. Knapp were trying to close the lease to the Coastwise Ship Building Company and to effect a settlement of the McComas Street appeals by the agreements with the city and railroad company referred to, they were also endeavoring to sell the lots and to find a purchaser for Mrs. McLean's stock. Mr. Knapp offered lots A, B, C and D to the Baltimore and Ohio Railroad Company for $350,000.00 in fee, which, after deducting the sum necessary to redeem the ground rents, would have left $146,000.00 for the leasehold interest, but the railroad company declined the proposition without making any counter offer. He also appealed to Mr. Frank Furst, who was familiar with the character of business in which the company was engaged and had ample means, to buy the stock of the company at $250.00 a share, but he would not entertain the proposition. Mr. Maloy, who was anxious to find some one to purchase Mrs. McLean's stock who was a practical engineer and who would continue the business in harmony with his clients, who were minority stockholders, finally appealed to Mr. Oscar B. Coblentz, a member of the bar of Frederick County, whom he had met in a professional way in connection with winding up the affairs of an engineering and contracting company, and with whose "practical ability" as a lawyer, engineer and business man he and his partner, Mr. Brady, "had then been much impressed." He communicated with Mr. Coblentz and invited him to come to Baltimore to discuss the proposition. Mr. Coblentz came to Baltimore in July and looked into the matter very carefully, but upon his return to Frederick he wrote Mr. Maloy on August 10th declining to "undertake the proposition" because he knew "practically nothing about the contracts along the seaboard." He stated in his letter that he had been very favorable "impressed with Mr. (Donald) McLean," that he knew "his business" and that he liked his "manner and person-

ality." Later in August Mr. Maloy induced Mr. Coblentz to come to Baltimore again for the purpose of discussing the matter of purchasing Mrs. McLean's stock. Mrs. McLean, who had in the meantime employed a very competent man to examine and value the plant and other property, belonging to the company, agreed to sell her stock in the company, consisting of the 382 shares then standing in her name, and her third of the 253 shares belonging to the McLean estate, making 466 shares, at $250.00 a share, and to sell to the company her one-third interest in lot D, which, as we have said, was subject to the ground rent of $4,739.04, for $10,000.00, provided the company would pay her $5,000.00 that it owed her, and would assume and pay $5,000.00 of the $20,000.00 assessment imposed by the city for the McComas Street improvement, and provided further the company would pay such part of the fees of Mr. Maloy and Mr. Knapp, administrators, and their attorneys, as might be agreed upon by the administrators and the attorneys and the company as properly chargeable against the company. This option to purchase her stock, etc., upon the conditions mentioned was given to Mr. Donald McLean on the 31st of August, and stipulated that the money was to be paid within thirty days from that date. It was not convenient for Mr. Coblentz to raise the entire amount necessary to pay for Mrs. McLean's stock, but he was willing to raise $50,000.00, so it was agreed by all parties interested (Miss Josephine McLean actively participating in all the negotiations) that if Mr. Coblentz purchased Mrs. McLean's stock there should be a distribution of the Arundel Sand & Gravel Company preferred stock owned by the McLean Contracting Company among the stockholders of the latter company in proportion to the number of shares of the latter company held by them, and that Mrs. McLean would accept in part payment for her stock of the McLean Company the preferred stock of the Arundel Sand & Gravel Company at $90.00 per share. It was also agreed that in the event that Mr. Coblentz purchased Mrs. McLean's stock upon the terms and conditions mentioned in said option of August

31st, that Miss Josephine and George McLean would sell their two-thirds interest in lot B to the McLean Company, and accept in payment therefor two notes of the company, each for $10,000.00 and bearing interest from date, one payable to Miss Josephine and the other to George McLean, and an agreement on the part of the company that they should share in the profits in the event that the lot should thereafter be sold for the prices therein mentioned; also that a distribution of the preferred stock of the Arundel Sand & Gravel Company owned by the McLean Contracting Company should be made among the stockholders of the latter company and that they would sell the shares of stock of the Arundel Sand & Gravel Company so received by them to Mr. Coblentz and Mr. Donald McLean and accept their notes in payment therefor. This agreement on the part of Miss Josephine and George McLean was in the form of a letter addressed to Mr. Coblentz and Mr. Donald McLean, dated September 6th, 1916, and signed by Miss Josephine and George McLean, with the acceptance of Mr. Coblentz and Mr. Donald McLean subscribed thereon, and is the agreement referred to in this case as the agreement of September 6th, 1916. The carrying out of these agreements for the purchase of Mrs. McLean's stock and of lot D necessitated the statement of an account by the administrators and a distribution to Mrs. McLean and the children of lot D and of the stock of the McLean Company belonging to the estate, and formal action on the part of the stockholders and directors of the McLean Company. The account was stated and distribution was made by the administrators, and appropriate action was taken by the McLean Company, in which Miss Josephine and George McLean participated, and Miss Josephine and George McLean each received one-third (84 shares) of the stock of the McLean Company belonging to the estate, and each received for their respective interest in lot D the promissory note of the McLean Company for $10,000.00, dated October 2nd, 1916, and bearing interest from date, together with the agreement for a contingent interest in the proceeds of a future sale of

the lot. Miss Josephine McLean also received for the stock of the Arundel Sand & Gravel Company distributed to her, and sold by her to Mr. Coblentz and Mr. Donald McLean for $90.00 per share, four notes of Mr. Coblentz and Mr. Donald McLean, each for $2,700.00, dated October 2nd, 1916, and bearing interest from date, with 70 shares of the stock of the McLean Company as collateral security, and George McLean received for the Arundel Sand & Gravel Company stock distributed to him, and sold by him to Mr. Coblentz and Mr. Donald McLean at $90.00 per share, four notes of Mr. Coblentz and Mr. Donald McLean each for $2,500.00, dated October 2nd, 1916, and bearing interest from date, with 64 shares of stock of the McLean Company as collateral security, the difference in amount of the notes being due to the fact that Miss Josephine owned 90 shares of the McLean Company stock while George owned 84 shares, and the distribution of Arundel Sand & Gravel Company stock to her was proportionately larger. As the result of these transactions Miss Josephine and George McLean not only disposed of their interest in lot D at a price thirty thousand dollars in excess of the ground rent redeemable at about $78,984.00, and which the estate was not in a position to carry, together with the contingent interest referred to, but they also received full value for their stock in the Arundel Sand & Gravel Company.

On the 31st of October settlements were made with the city and the Baltimore and Ohio Railroad Company in pursuance of the agreements of August 28th, and the administrators received the following amounts:

| | |
|---|---:|
| From the B. & O. R. R. Co., for part of lot E. | $12,249.59 |
| From the B. & O. R. R. Co., for part of lot F. | 14,263.86 |
| From the B. & O. R. R. Co., for part of lot G. | 38,341.83 |
| From the B. & O. R. R. Co., for part of lot H. | 56,236.96 |
| From the city for the balance of lot H... | 82,005.10 |
| Total | $203,097.34 |

The city deducted the $20,000.00 agreed to be paid on account of the assessment, and with the balance of the amounts so received the administrators were able to pay off the mortgage of $25,068.33 on lot F, the mortgage of $20,202.29 on lot E, to redeem the ground rent on lot H at $88,661.17, and pay the taxes on the lots. The owners of the fee in lot G agreed to let the ground rent on that lot of $3,900.00, redeemable at $65,000.00, stand on the remainder of lot G, provided a mortgage of the balance of lot E be given as additional security for the rent, and the administrators did not therefore have to pay the $65,000.00 to redeem that ground rent, and after making the payments mentioned they had about $45,000.00 which could be applied to the payment of other debts of the estate, etc.

The threatened liquidation of the McLean Company and the destruction of the property by the opening of McComas Street and the assessment of $80,000.00 by the city having been avoided, and the company now being in friendly and competent hands; Miss Josephine and George McLean having each received 84 shares of the stock of that company, and having also assured incomes of $1,200.00 a year from the proceeds of their interests in lot D and the Arundel Sand & Gravel Company stock, and the settlement with the city and Baltimore and Ohio Railroad Company having been completed, things began to look more encouraging, and while conditions were still complicated and there were difficulties to be encountered and overcome, the administrators were approaching the end of their trust, and counsel for Miss Josephine and George McLean had reason to hope for something more substantial for their clients. The estate still owned the unsold portions of lots E, F and G and the Park Heights Avenue property, lot No. 1. Lots E and F were in fee and free from incumbrances, but lot E was unoccupied and yielded no income, while the revenue from lot F was uncertain, and was derived from tenants who, from time to time, desired storage space on the pier, but who could not be induced to accept or

execute permanent leases. Lot No. 1, the Park Heights Avenue property, from which there was no income, was subject to a building association mortgage which required weekly payments of about $90.00. The situation in regard to lot G was about as follows: Continuing the negotiations begun by Mr. Colin McLean, the administrators (the widow and children uniting in the lease) succeeded in July, 1916, in leasing the lot, at an increased rent, to the Coastwise Ship Building Company for the term of five years, for $6,500.00 a year, with the right of renewal for a like term for $8,500.00 a year, etc. At the time the lease was executed the administrators were negotiating the sale of a part of the lot to the railroad company, and when the agreement with the railroad company was made in August, the administrators, because of the lease referred to, were not in a position to give the railroad company possession of the part purchased by it, and therefore in the contract of sale the administrators and next of kin agreed to pay the railroad company six per cent. on the contract price of $38,341.83 until they could deliver possession, and they had also to agree in the lease to the Coastwise Company that in case the railroad company took possession of part of the lot to extend, at their cost, the bulkhead line of the lot three hundred feet and to fill in behind the bulkhead so as to give the Coastwise Company the amount of land included in the lease at the date of its execution. The ground rent on the lot of $3,900.00, the interest payable to the railroad company, amounting to about $2,300.00, and the taxes, amounting to about $1,000.00, exceeded, therefore, the rent of $6,500.00 from the Coastwise Company, and the lot was consequently a burden instead of a source of revenue to the estate. In addition to the lots the estate owned the stock of the Boston Sand and Gravel Company heretofore mentioned. The widow and two children of the decedent were each entitled to one-third of the personal estate, while the widow, under the rule, in lieu of dower, was entitled to one-ninth and each of the children to four-ninths of the real estate, and the children were also entitled to have the per-

sonal estate applied to the payment of incumbrances on the
real estate.

After completing the settlements with the city and the rail-
road company, the administrators began the preparation of
their second and final account. There was not sufficient cash
to pay the debts and costs and expenses of administration,
and if there was to be a distribution in kind of the property,
as in the first account, the account would show an indebted-
ness of the widow and next of kin to the estate. The condi-
tion of the estate was gone into and fully discussed in detail
by Mr. Maloy, Mr. Brady, Mr. Knapp and Miss Josephine
and George McLean on November 18th. Mrs. McLean had
very little faith in the value of the lots, and that view, and
the possibility of an obligation arising under the agreement
in the lease to the Coastwise Company, made her unwilling
to hold on to any of the lots. The amount she would owe the
estate, if she and the children took the properties, after de-
ducting her share of the real estate already sold (being parts
of lots E and F, the proceeds of which had been received by
the administrators), was then estimated to be about $16,-
000.00, and Mr. Knapp informed Mr. Maloy that rather than
pay what she would owe the estate she would be willing to
transfer to Miss Josephine and George McLean all her inter-
est in lots E, F, G and No. 1, if they would assume her in-
debtedness to the estate, and they practically decided that
day that they would do so provided they could get her inter-
est at the proper price, the account not having been stated
and the exact amount of her indebtedness not yet ascertained.
At the same meeting of the parties the approximate amount
of Miss Josephine's and George's indebtedness to the estate,
in case they took the lots, was also ascertained, and the ques-
tion of what they should do with the properties, what was the
wisest course for them to adopt, whether to borrow a sufficient
amount to carry, improve and rent them with the view of
getting the benefit of any future advance in their value and
a sale (all efforts to sell them having so far failed), or to
sell them to some one or some company who would improve

the lots and secure the purchase-price by a lien on them, and
thus acquire a fixed and permanent income, letting the pur-
chaser assume the risk while taking the chance of profits, was
fully discussed. Mr. Maloy suggested that it might be well
for them to borrow the money necessary to carry the lots,
with the view of getting the benefit of a future sale, but Miss
Josephine and George positively refused to do that. In order
that they might have the condition of the estate and of the
several lots, and the several propositions discussed, before
them in writing, Maloy & Brady two days later, on Novem-
ber 20th, wrote to Miss Josephine and George giving them a
very full and clear statement of the situation in respect to
each of the lots and of the probable result of the final ac-
count, and also of the several courses that might be adopted
by them in disposing of the properties, and urging them to
give the matter careful thought and consideration. Miss
Josephine, unknown to Mr. Maloy, sent this letter to Mr.
Dall, who was a building contractor and a man of business
experience and ability, and who she afterwards married, and
whose advice she had also taken before she decided to dis-
pose of her interest in lot D by the agreement of September
6th, 1916, and he wrote for her the following letter in reply:

"Washington, D. C., November 29th, 1916.

"Messrs. Maloy and Knapp,

"Administrators, Estate of Colin McLean.

"Gentlemen:

"I have your letter of November 20th, concerning
the affairs of the estate of my father, and while this
seems to be a very comprehensive report as to the
respective interests of those concerned, there are some
things, regarding the liability of which, I do not
quite understand. I assume that the inventory filed
with the Orphans' Court is substantially correct and
that the statement you are now preparing will be in
such form that each parcel will be a separate account
by itself. If this is done I shall be sooner and better
able to talk intelligently to you, as it is my purpose

with your assistance to arrive at some basis of defi-
nite procedure or settlement, as early as possible
along the lines of the established means which you
have suggested.

"You will recall the early resolutions passed at the
first meeting of the McLean Contracting Company,
after my father's death, and the subsequent develop-
ment of our affairs. Both my brother and I have
always depended upon your judgment, and we have
co-operated with you in working on these affairs ac-
cording to your notion of what should be done. Our
anxiety from time to time has prompted us to ask
about the ultimate result of our interests, and you
have led us to believe that both he and I would receive
from the personal estate such an amount as would
yield an income of not less than five thousand dollars
a year. Now that the method of dealing with the
personal affairs is nearing decision, I urge you to
keep in mind the wishes of my father and secure for
us the protection he desired. Assuring you of our
continued co-operation and grateful always for the
assistance you have rendered, I remain,

"Yours very sincerely,

"Josephine McLean."

Mr. Maloy did not know Mr. Dall, and he says that this
letter gave them a shock because it was "out of accord" with
their discussion with Miss Josephine and George; that there
was no justification for the statement that he had led her to
believe that the amount they would receive from the estate
would yield each of them an income of $5,000.00, and that
he knew that Miss Josephine could not have written it. On
December 11th Maloy & Brady wrote Miss Joephine the fol-
lowing letter, enclosing a copy of the final account of the
administrators, which was passed on December 6th, and again
giving her a statement of the situation and of the possible
plans to be pursued by her, and urging her to consult some
friend in regard to the matter:

"Baltimore, December 11th, 1916.

"Miss Josephine McLean,

    "The Brighton, California St.,

      "Washington, D. C.

"My Dear Miss McLean:

"Mr. Maloy and Mr. Knapp received your letter of November 29th, and I asked the privilege of answering it. Unfortunately as I have been engaged in court, I have been delayed a few days.

"Your letter would suggest a desire for information along two lines—first, what are the existing conditions, and, second, what are the prospects? I am enclosing a copy of the administration account—that is to say, the second account. The paper will probably seem long, but it consists practically of two parts—first, the complete account, except as to the items of the McLean Contracting Company. The balance of the paper is an itemized statement as to the McLean Contracting Company, except as to the personal drawings of you, Mrs. McLean and Mr. George McLean. This paper is the result of the matter as submitted by the administrators to the court and gone over by the court auditor. You will note that on the page which I have marked eight, the administrators have advanced to the next of kin $56,339.58. In order to liquidate all indebtedness, the administrators would have to advance said sum of money, but they have not actually done so. They charge themselves with the mortgage of $20,619.20. This has not been paid. They charge themselves with paying to you, Mrs. McLean and Mr. George McLean, as heirs at law, $23,671.25, or with paying to Mrs. McLean one-ninth—that is to say, $2,630.11; to Mr. George McLean $10,520.56, and to you $10,520.55. If you, Mrs. McLean and Mr. George McLean each, as next of kin, were to pay to the administrators the sum of $18,779.86, the administrators could pay off the mortgage and return to Mrs. McLean, Mr. George McLean and to you the sums above mentioned and at the same time pay off the other unenumerated items, which are mentioned in

the account and which go to make up the total over-payment of $56,339.58.

"If you subtract from the indebtedness due by each of you as the next of kin the amount standing as to credit to each of you, as an heir at law, and if in addition thereto, the administrators pay the personal indebtedness due by each of you, in the varying amounts to the McLean Company as of the time when you were last here, or rather immediately prior thereto, your indebtedness to the company being put at $850.00, Mrs. McLean would owe to the administrators $17,-116.49, Mr. George McLean $12,738.78, and you $9,-109.31.

"The property which you would own would be as we have already informed you. You would, under such conditions, have the Park Avenue property free of any indebtedness, and you would have lots E and F free, and you would have lot G subject to the ground rent. These properties would be held as to the Park Avenue property and lots E and F with a ninth to Mrs. McLean and four-ninths to each of you. Lot G would be owned by the three of you in equal shares. You would have, in addition thereto, the stock which has already been mentioned and which is worth more than $2,500.00 as to each share.

"Mrs. McLean will, as we understand it, surrender all her interest in the properties, except as to the stock, provided that you and your brother assume her indebtedness to the administrators. She will, I believe, in addition thereto, pay about two thousand dollars so as to reduce her indebtedness from approximately $17,-000 to $15,000.

"Under these circumstances, and with Mrs. McLean eliminated, we find that there is a total overpayment of $56,339.58 due by you and your brother, but that there is due back to you the money belonging to the heirs at law $23,671.25, leaving an indebtedness of $32,668.33. Part of this indebtedness can be provided for by taking over the Park Heights Avenue property, subject to the mortgage of $20,619.20, leaving an in--

debtedness of $12,049.13. You, of course, appreciate
the fact that the property, most of which is unpro-
ductive, is a burden, and hence from the time of your
last visit, certain items of expense have been accru-
ing and will continue to accrue. The taxes, however,
on all the properties have been paid for the year 1916,
and the expenses are not great.

"The future may apparently be solved in three
ways—first, you may take the property and seek to
use it as you in your judgment may deem best, bear-
ing in mind that while valuable it is unproductive.
Secondly, we may under your direction endeavor to
secure tenants so as to make the property productive.
We believe that tenants can be secured for the prop-
erty and that the property can be made to produce a
good income. We are prepared to undertake to secure
tenants, but where they may be secured and how they
can be secured are unknown quantities. Whether they
would be permanent tenants or not or whether they
would require the making of large and expensive or
small inexpensive improvements are matters that can
only be determined after we have made a try and you
have waited, leaving the expenses to accrue without an
income. Thirdly, we may endeavor to secure, and
since your last interview have mentioned it to one
party, a permanent income from the party for you.
We believe that a fair income can be secured. We
believe that we can secure an income sufficiently large,
permanently and satisfacorily secured, so as to be
attractive to you, and we believe but do not urge that
this is the thing to be done. Just the amount of the
income and just the method of securing it are impor-
tant details which need to be worked out. We believe
that an income of $4,000 and possibly $4,500 (and a
try for $5,000) to you and a similar income to your
brother can be had from all of your interests in the
McLean Company and the McLean estate.

"We would like to go over this with you again at
your earliest convenience, and will be glad to have you
either talk the matter over with some friend in Wash-

ington, or have you bring said party here, and let him or them go over the matter with you.

"Awaiting your convenience for an appointment, we are,

"Yours sincerely,

"Maloy & Brady."

"GMB—JM.

"December 11, 1916.

"P. S.—In addition to the indebtedness of twelve thousand dollars as mentioned on the second page, you must not, in case you borrow money and carry the property, forget the amounts received by you and the others on drawing accounts with the McLean Company, as mentioned on top of page two. Mrs. McLean's was about a thousand, yours eight hundred and fifty, subject to subsequent additions, and your brother George's about forty-five hundred.

"Yours very truly,

"Maloy & Brady."

"GMB—MMS."

Up to the time of writing this letter of December 11th neither Mr. Maloy nor Mr. Brady had the slightest adverse interest to their clients. The party referred to in that letter as "one party" to whom they had mentioned the matter was Mr. Coblentz, but Mr. Coblentz had not up to December 11th expressed a desire or willingness to make an arrangement to purchase the property, and Mr. Donald McLean, who knew of the trouble and worry that Mr. Colin McLean had experienced with the lots, was opposed to his doing so. However, shortly after the letter of December 11th was written, Mr. Coblentz and Mr. Donald McLean were told by Mr. William T. Moore, the agent of the Baltimore and Ohio Railroad Company at Locust Point, who had been a friend of Mr. Colin McLean and who had assisted the administrators in securing temporary tenants for lot F, that the Garland Steamship Company might be secured as a tenant for lot F. That

company had been using the railroad company's piers, but as
it stored cotton, etc., on the piers, and as that use of the piers
increased the cost of insurance of other property on the pier,
the railroad company was anxious to get rid of the Garland
Company, and the Garland Company was also anxious to
secure other accommodations because of delays it frequently
incurred in having to wait sometime before it could get the
use of the railroad company's pier. It was understood that
the Garland Company would probably lease the pier on lot F
for one year and pay $15,000.00 a year, but that in order to
secure the lease the owner of the lot would have to spend
from $15,000.00 to $30,000.00 for improvements. Mr. Cob-
lentz saw Mr. Maloy on December 13th and told him of the
Garland Company, and that he and Mr. Donald McLean
would be willing to form a company with a capital stock of
$20,000.00 to purchase all of the interests of Miss Josephine
and George, and that each of them would take $5,000.00 of
the stock provided that Mr. Maloy and Mr. Brady, as evi-
dence of their faith in the undertaking, would each take
$5,000.00 of the stock. Another reason why Mr. Coblentz
wanted Mr. Maloy interested was that the city had in con-
templation some plan in reference to what is referred to as
"incline piers" in the harbor, and as these plans were very
objectionable to the owners of piers, and as Mr. Maloy had
been very successful in dealing with the city in the matter
of the opening of McComas Street, Mr. Coblentz wanted to
make certain of his help and influence to get rid of that
menace. Mr. Maloy told him that he and Mr. Brady were
counsel for Miss Josephine and George McLean, and that they
could not take any stock in the proposed company without
their consent and approval. On the same day, the 13th, Mr.
Maloy called Miss Josephine up by telephone and started to
tell her of the proposition, but she, apparently having some
one with her before whom she did not care to discuss it, told
him that she would be over to see him on Friday, the 15th,
and that he could tell her about it then. She accordingly
came over to see Mr. Maloy on the 15th and he then told her

(Mr. Brady being present) of Mr. Coblentz's willingness to form a company to purchase all her interests and George's interests, including all their interest in the estate and what they received under the agreement of September 6th, and to secure them a fixed income from the property, provided that he and Mr. Brady would each take $5,000.00 of the stock, and that he had told Mr. Coblentz that he and Mr. Brady could not do that without her and George's consent and approval. She assented to the plan proposed, except that she was anxious to retain the Boston Sand and Gravel Company stock they were to receive from the estate, she having received some information indicating that it was going to be worth more than its then value would indicate. Up to that time Mr. Coblentz had not expressed a willingness to secure as their income more than $4,000.00 a year to each, and she was willing to accept that amount, if that was the best could be done, but it was understood when she and Mr. Maloy parted that day that he would try to get Mr. Coblentz to agree to go as high as $5,000.00 for each of them, using his consent to take some of the stock of the proposed company as an inducement. She and George had already determined to purchase Mrs. McLean's interest in the estate and properties and to assume her indebtedness to the estate according to the plan already mentioned, and as the matter of the lease to the Garland Company did not appear to be pressing at that time she contemplated spending the Christmas holidays in New York with her brother George. On the 19th of December Mr. Maloy, according to the course apparently followed throughout their dealings with Miss Josephine and George, prepared a letter addressed to both of them, giving in detail the plan discussed and tentatively agreed upon in the conversation with Miss Josephine on the 15th, asking her to talk over the matter with George "again," stating that Mr. Coblentz had consented to make the yearly income to be secured to each of them $5,000.00, and saying at the conclusion of the letter: "There is one feature of the matter which we desire you to understand thoroughly. Mr. Coblentz is loath

to take up the matter unless we go in with him, are willing
to help him work out the proposition, and also to show our ·
faith by investing some money in the plan. Representing you
we declined to do this unless it be with your knowledge and
approval. I informed you of this when you were in Balti-
more the other day, but want you to understand it thorough-
ly." This letter was never mailed, and that is accounted for
by what followed that day. Mr. Coblentz received word from
New York that the question of leasing lot F to the Garland
Steamship Company had to be decided at once, and he called
up Mr. Maloy and asked him to communicate immediately
with Miss Joephine (by whose course George was largely
guided in all matters connected with the estate). Mr. Maloy
called her up in Washington, told her that Mr. Coblentz had
agreed to make the income to be secured to each of them
$5,000.00, and also to their retention of the Boston Sand &
Gravel Company stock, explained the necessity for immedi-
ate action and asked her to come to Baltimore to talk over the
matter and, if necessary, to execute the necessary agreement.
She replied that she had engagements with the dentist that
would "occupy her the next few days." He told her that if
she could not come to Baltimore they would go over to Wash-
ington to see her, but she said "the next few days were filled
up," and that she would see them when she got back from
New York. He explained that the matter could not be put
off, and told her that if they did not want to convey their
interests according to the plan they had discussed she and
George could secure the lease for themselves and that he would
help them to raise the money to make the required improve-
ments, and urged her to come over, but she said she would not
make the improvements for a one-year tenant, would not con-
sider it. In the afternoon of the same day, when Mr. Cob-
lentz came to Mr. Maloy's office, feeling that probably Mr.
Maloy had not made the matter sufficiently clear to her, he
got Mr. Brady to call her up with the same result. Mr.
Maloy and Mr. Coblentz could not understand this apparent
sudden indifference on the part of Miss Josephine to what

they regarded as a very important matter affecting the propo-
sition theretofore considered and practically agreed upon,
and as the result of their failure to get co-operation from her
they both regarded the whole matter at an end, and the letter
of the 19th was not mailed, and Mr. Coblentz immediately
entered into arrangements to lease lot D, belonging to the
McLean Company, to the Garland Steamship Company. The
explanation of Miss Josephine's conduct, as it appeared later,
was that she had already sent the letters of November 20th
and December 11th and a copy of the final account to Mr.
Dall, and had arranged with him to meet her in Pittsburg
before she went to New York for Christmas so that he could
advise her in regard to her answer to the letter of December
11th, and did not, therefore, want to decide the matter her-
self on the 19th, further than to definitely turn down the
proposition to spend money on lot F for the purpose of secur-
ing the Garland Company lease. On the 21st of December
she wrote Mr. Maloy that in view of her telephone conversa-
tion with Mr. Brady on the 19th there was some doubt in her
mind as to whether it was necessary for her to see him as
early as December 27th; that she did not wish to leave New
York "at so early a date" if a later one would do as well, and
asking him to advise her at her brother's address, and at the
same time to advise her of the particulars of the proposed
lease of lot F. Upon the receipt of this letter Mr. Maloy
wired George to tell her that it was not necessary for her to
come to Baltimore on the 27th, and on the 23rd (Saturday
before Christmas) he wrote her that he was glad to hear from
her because he could not understand her attitude on the 19th;
that he thought at the time that he was acting in accordance
with her desire and decision in the matter, and that it had
been rather trying to see the work of so many days and nights
treated so lightly; that as she had refused to make the neces-
sary improvements on lot F, Mr. Coblentz and the McLean
Company had secured the lease to the Garland Company, and
that that was now a "matter of the past," and that he hoped
it would not result in a loss to her, and that if she would

come to see him when she returned from New York and let him know frankly and candidly what she wanted to do they would do their best to work out some plan in accordance with her views. In the meantime Miss Josephine met Mr. Dall in Pittsburg, and he wrote for her there a long letter addressed to Mr. Maloy and Mr. Knapp, administrators, and she took it with her to New York, wiring George to meet her at the depot, and she and George signed it in the depot in New York and mailed it that day, the 25th, by special delivery. This letter begins by saying that it is in answer to the letter of December 11th, and then says:

"It is not our purpose at this time to question any of the figures you have presented to the Orphans' Court, but as more fully explained to you in Miss Mc-Lean's letter of November 29th (sanctioned by George McLean, and letter hereinafter referred to as coming from both of us), we desire to adjust matters on a basis of a fixed income."

It states that in entering into the agreement of September 6th they depended entirely upon the opinion of the administrators, although feeling that they were making substantial sacrifices for the benefit of the McLean Company, and that they had become reconciled to the opinion of the administrators because of their assurance that they would each realize an income of $5,000.00 out of the estate without involving their interest in the McLean Company, while the letter of December 11th stated that an income of from $4,000.00 to $5,000.00 might be obtained for each of them for all their interest in the McLean Company and the McLean estate, together with their holdings in the Boston Sand & Gravel Company. After a long reference to figures in support of an argument that the value of the properties would justify a fixed income to each of them of about $6,700.00 instead of $5,000.00, they say:

"Upon the foregoing we do not mean to imply that we intend to hold out for these amounts, but it seems to us we are too far apart in our valuations. * * *

We do not know how the proposed purchaser's figures
are made up or how he arrived at such amounts.   Ac-
cordingly, we desire your further co-operation in as-
sisting us in determining the true value of things.
* * *   We will be in your office Wednesday afternoon,
December 27th, to go over this matter with you, and
we hope that this meeting will lead to an early, if not
an immediate, adjustment."

Mr. Maloy very naturally resented some of the statements
and intimations contained in that letter, and after consulting
Mr. Knapp, in his reply, addressed to Miss Josephine and
George in New York and dated December 27th, he gave a
full statement of the lots to which they were entitled (they
having taken over Mrs. McLean's interest), of their stocks in
the Boston Sand & Gravel Company and the McLean Com-
pany, their notes of Mr. Coblentz and Mr. Donald McLean
and their notes of the McLean Contracting Company, and
said that the administrators were ready to turn-over the prop-
erty to them and desired to do so at once and close the estate,
and that it was only necessary for them to raise about $18,-
000.00 to pay the debts and expenses.   After a reference to
some of the statements and intimations contained in their
letter, and after referring to some of the results he felt had
been accomplished for their benefit, the letter concluded with
the statement that the administrators desired to complete the
administration, and

"Under no circumstances would we be willing to
submit you a proposition unless it be along lines deter-
mined upon by you after consultation with someone in
whom you have confidence and upon whose advice you
will be willing to rely.   Should Mr. Grannan or Mr.
Dall come to Baltimore to talk over the matter and
tell us what he wants us to do, then we would be will-
ing to carry out instructions, but for the present we can
only say that we are ready to close the estate."

Notwithstanding the telegram telling them not to come to
Baltimore, Miss Josephine was determined to come and she

and George arrived in Baltimore in the afternoon of the 27th and telephoned to Mr. Maloy from the Emerson Hotel to make an appointment with him, but he declined to see them until they had seen his letters of December 23rd and December 27th, and that evening he sent copies of those letters to them at the Emerson Hotel. The next morning they called up Mr. Maloy and went to his office to see him. When they expressed a purpose and desire to take up the matter of disposing of their property to a company to be formed for that purpose with the view of securing a fixed income Mr. Maloy refused to do so, and told them that the Garland Company lease was no longer available as Mr. Coblentz had leased lot D to that company, and that neither he nor Mr. Coblentz would consider a proposition to take their properties. Miss Josephine and George began to realize that their chances of disposing of their properties so as to acquire a fixed and permanent income, which they had always been so anxious to secure, and which, notwithstanding the telegram, had induced them to come to Baltimore with a definite and determined purpose to reach a final and immediate settlement, were disappearing, and they became so insistent that Mr. Maloy finally relented to the extent of agreeing to call up Mr. Coblentz and to ask him to come up to his office to see them. Mr. Coblentz at first refused to come, but at the request of Mr. Maloy he later consented. Mr. Coblentz met them in Maloy & Brady's office after lunch, and Mr. Donald McLean came up later, and when they asked Mr. Coblentz to renew the proposition to form a company to take their property and secure them an income he refused to do so, saying that he had leased lot D to the Garland Company, and that he (or the Contracting Company) was required to make improvements to the amount of from $30,000.00 to $50,000.00 on that lot. He and Mr. Maloy advised them to keep their lots and offered to help them to carry and manage them, but they were not willing to do that and persisted in their efforts to persuade Mr. Coblentz to resume the former plan. Mr. Brady and Mr. Donald McLean were also opposed to it, but

they finally consented to consider it, and the entire afternoon and evening, up until after ten o'clock, was spent in discussing the details of the arrangement and the preparation of the agreement. As the proposed company was to have a capital stock of $12,000.00 and Mr. Maloy and Mr. Brady were each to subscribe to one-fourth of the stock, after the terms of the agreement had been fully discussed Mr. Coblentz asked Miss Josephine and George if they would not like to have some other attorney to represent them and to prepare the agreement, and Miss Josephine replied: "It would take an outside attorney a long time to get familiar with all the details of the proposition, and I am not afraid that either Mr. Maloy or Mr. Brady will put anything in the contract different from what we have actually agreed on." The agreement was prepared that evening and was read over by Miss Josephine and George, and, according to her recollection, was signed by her and by George that evening before they left Mr. Maloy's office. The recollection of others present is that it was signed by them on the 30th. The agreement was dated "this —— day of December, 1916," and was between Josephine McLean and George McLean and Alice McLean, his wife, "the parties of the first part," and "The McLean Wharf and Warehouse Company, a body corporate, duly organized under the laws of the State of Maryland, party of the second part." By the first paragraph Miss Josephine and George agreed to convey to the company in fee simple, subject to the building association mortgage, the Park Heights Avenue property, and by the second paragraph they agreed to lease to the company for the period of ninety-nine years, renewable forever, lots E, F and G at and for the annual rent of $10,000.00, payable monthly in advance, together with all their interest in the lease of lot G to the Coastwise Company, and in that part of lot G sold to the Railroad Company and leased back to them. The third paragraph provided that said property should be leased "as commercial or business property as provided by Chapter —— of the Acts of the General Assembly of Maryland of the year 1914," and

that the rent should be subject to redemption at any time "upon a five per cent. basis," and in the fourth, fifth, sixth, seventh, eighth and ninth paragraphs the parties of the first part agreed to endorse, transfer and deliver to the company the notes held by them against Mr. Coblentz and Mr. Donald McLean and against the McLean Contracting Company, their stock in the McLean Contracting Company and that held by them as collateral, and to assign to the company all their right to share in the profits that might accrue from lot D, and to deliver all insurance policies on the property leased. By the tenth, eleventh and twelfth paragraphs it was provided that the company should agree to pay the rent of $10,000.00 as therein provided, should secure *bona fide* subscriptions to the capital stock of the company "to be used for the benefit of the company to the amount of" $12,000.00, and should endeavor to develop and lease lots E and F to make the same productive so as to better secure the "rent charged upon lots E, F and G." The fourteenth and fifteenth paragraphs provided that the company should secure from the McLean Contracting Company in lieu of the said $20,000.00 obligations of the Contracting Company a ground rent for a similar amount secured by lot D held by the Contracting Company, and should execute an assignment of such ground rent to the parties of the first part to be held by them, without recording the same, as additional security. The sixteenth paragraph provided that said notes of Mr. Coblentz and Mr. Donald McLean and the collateral therewith, the 174 shares of the McLean Contracting Company stock, the assignment of the ground rent on lot D, and the "said assignment * * * to the special profits in lot D" should be placed in a safe deposit box of some financial institution of Baltimore, subject to the joint control of the parties of the first and second part to be held as security for the payment of the rent of $10,000.00. The seventeenth and eighteenth paragraphs required the company to assume and pay the mortgage on the Park Heights Avenue property, and to make good the over-payments due by the parties of the first part and

by Mrs. McLean to the administrators of Colin McLean, and the nineteenth paragraph provided that the company should be entitled to hold free and discharged from its pledge as security any of the notes, shares of stock and assets in said deposit box "valued at their market value to an amount equal to the amount of money which" it might thereafter expend upon lots E, F and G for permanent improvements and betterment over and above the first $12,000.00. The twentieth paragraph provided that in the event that any of the notes placed in the safe deposit box be paid in whole or in part, or the said stock of the McLean Contracting Company "be called in or reduced and the money received in whole or in part," or said special agreement "in regard to special profits" be "fulfilled in whole or in part and money be received therefor" or said ground rent on lot D be redeemed and money received therefor, the parties of the first part, "after notice in writing of said payment, etc.," should within thirty days after receipt of said notice elect either to permit the party of the second part to reduce the ground rent of $10,000.00 "by reducing the same according to the amount of money received capitalized at six per cent.," or to permit the party of the second part to exercise the choice either of spending the money so received in permanent improvements on "the lots firstly, secondly and thirdly described," or in reducing the ground rent of $10,000.00 according to the amount of money received capitalized at five per cent. In the twenty-first and twenty-second paragraphs the company assumed the obligations of the parties of the first part under the lease to the Coastwise Company, and the payment of all their obligations and the obligations of Mrs. McLean to the Contracting Company. The twenty-third paragraph provided for the redemption of the ground rent by the delivery of bonds of the par value of $200,000.00 of an issue not to exceed $400,000.00, bearing interest at five per cent., secured by a mortgage deed of trust to some financial institution organized under the laws of Maryland conveying to it all the company's interest in lots E, F and G, the bonds in excess of

the $200,000.00 to be retained by the trustee and delivered to the company to the extent of eighty per cent. of permanent improvements made by the company on said lots upon the certificate of two or more reputable engineers that permanent improvements or betterments had been so made, and by the twenty-fourth paragraph the parties of the first part agreed that the ground rent should be "remitted" to the amount of $2,400.00 for the first year and to the amount of $1,800.00 for the second year.

The result of this agreement was that Miss Josephine and George agreed to convey to the McLean Wharf and Warehouse Company lots E and F, which were in fee, lot G, which was subject to the ground rent redeemable at $65,000.00 and further secured by lot E, and also subject to the obligations under the lease to the Coastwise Company and the contract with the railroad company, the Park Heights Avenue property subject to the building association mortgage of $20,-000.00, their notes of Mr. Coblentz and Mr. Donald McLean to the amount of $20,000.00, their notes of the Contracting Company for like amounts, their right to share in the profits of a sale of lot D, and their 174 shares of stock of the Contracting Company, valued at about $20,000.00, in consideration of the assumption by the company of their debt to the estate, their and Mrs. McLean's indebtedness to the Contracting Company and the mortgage to the building association, and an annual ground rent of $10,000.00, redeemable at $200,000.00, secured by a lease of lots E, F and G and further secured by said notes, stocks, etc., as collateral. The company was incorporated and immediately began the improvement of lot F, the lease was executed under date of January 3rd, 1917, redeemable at $200,000.00, and the notes, stocks, etc., were transferred to the company and subsequently put in the safe deposit box (although the requirement as to joint control was not strictly complied with because the plaintiffs were non-residents and did not want to have to come to Baltimore to open the box), and after receiving part of the rent, which was payable monthly in advance, account-

ing from the first of January, Miss Josephine and George
left Baltimore on the 30th, Mr. Dall, who was in Baltimore
while they were there, joining Miss Josephine at Union
Station, and about a week after reaching home George wrote
Mr. Maloy thanking him for the successful manner in which
the administrators had handled the estate, and expressing the
hope that he would let him know whenever he was in New
York. On January 15th, 1917, Miss Josephine in her letter
to Mr. Maloy, after acknowledging receipt of several letters
sent her, said:

> "I sincerely hope that the affairs of the company
> are progressing favorably and that you have every rea-
> son to feel assured of ultimate success. Pleasing and
> profitable opportunities are daily presenting them-
> selves to Mr. Coblentz and Donald, I hope, and a
> bright year will encourage them to proceed with an
> ever increasing enthusiasm and faith in the undertak-
> ing which they have assumed. I am always hoping
> for their advancement and success, and I think it is
> unquestionable as a result of their industry and earnest
> endeavors. Will you please extend them my best
> wishes for their success and well-being. I am almost
> quite recovered from my recent illness; each day I am
> feeling better. Both you and Mrs. Maloy are well, I
> hope. I like to think that some time you will both
> see me in a more intimate way, in my home, perhaps,
> or wherever I may be living. Kindly remember me
> to Mrs. Maloy, please. With kind regards and sin-
> cere gratitude to you, I remain, yours sincerely."

After the declaration of unrestricted submarine warfare
by the German Government on the last of January the prob-
ability of the United States entering the war caused greater
demand for water-front properties in and around Baltimore,
and in March Mr. Coblentz, or the Contracting Company,
was offered $437,500.00 by the Baltimore Drydocks Com-
pany for lots A, B, C and D, which Mr. Colin McLean, Mr.
Maloy and Mr. Coblentz had repeatedly offered to sell for

$350,000.00, in fee, as an asking price. The offer was promptly accepted and the Contracting Company, after redeeming the ground rents, realized about $223,000.00 for its interest, less the commissions on the sale and about $75,-000.00 spent by it for improvements on the property. Notwithstanding they had transferred their stock of the Contracting Company to the Wharf and Warehouse Company, Miss Josephine and George continued to act as directors of the former company, and at a meeting of the board of directors of that company on April 28th, 1917, at which they were present, a resolution was passed authorizing the sale to the Drydocks Company and declaring a dividend of one hundred and thirty per cent. on its stock, and later Miss Josephine and George also executed a confirmatory deed of lot D. The dividend received by the Wharf Company on the 174 shares transferred to it by Miss Josephine and George was treated by the Wharf Company as pledged as additional security for the rent, and was invested and the securities therefor were placed in the safe deposit box.

In June, 1917, Mr. Coblentz, Mr. Maloy, Mr. Brady and Mr. Donald McLean, owners of the stock of the Wharf Company, were considering a sale of lots E, F and G to the H. E. Crook Company, and believing that they could as individuals, better carry out the terms of the sale and at the same time give greater security to the ground rent owned by Miss Josephine and George, they determined to take the property of the Wharf Company and to dissolve that company. After the matter was explained to them, Miss Josephine and George on the 26th of June, 1917, entered into an agreement with the Wharf Company by which the company agreed, for itself, its successors and assigns, within one year from May 1st, 1917, to make permanent improvements, in addition to those existing on May 1st, 1917, on lots E, F and G to the amount of $20,000.00 and to cause the ground rent redeemable at $65,000.00 on lot G to be redeemed within fifteen months from the date of the agreement, and Miss Josephine and George agreed that upon the making of said improve-

ments and the redemption or release of said ground rent the promissory notes, shares of stock and their contingent interest in lot D should be held free and discharged of all claims on their part to the same as additional security for their ground rent of $10,000.00, and did thereby consent to the immediate dissolution of the company, provided it entered into proper arrangements with responsible parties for the carrying out of the agreement. On the same day Miss Josephine, George and his wife, as parties of the first part, and Mr. Coblentz, Mr. Maloy, Mr. Brady and Mr. Donald McLean, as parties of the second part, entered into an agreement in which, after referring to the agreement of December, 1916, to the lease of January 3rd, 1917, to the fact that the Wharf Company had assigned the property therein mentioned to the parties of the second part, subject to the lien of the parties of the first part, they agreed that the parties of the second part should within one year from May 1st, 1917, make or cause to be made the permanent improvements mentioned in said agreement of June 26th, and that they should cause the said lease securing the ground rent redeemable at $65,000.00 on lot G to be "released and discharged" within fifteen months from June 26th, 1917, and the parties of the first part agreed that upon the making of said improvements and the release of said ground rent, the said notes, shares of stock and interest in lot D should be held free and discharged from all claims of the parties of the first part thereto as security for the rent of $10,000.00 created by the lease of January 3rd, 1916. Mr. Coblentz, Mr. Maloy, Mr. Brady and Donald McLean received from the H. E. Crook Company as the consideration for the sale of lots E, F and G $115,000.00 in the bonds of that company ($75,000.00 of which were held by the trust company to secure the redemption of the ground rent on lot G at $65,000.00) and $25,-000.00 in cash, but under the terms of sale they had to pay $5,000.00 of the cash so received for certain improvements on the property and to invest the balance of $20,000.00 in the stock of the company at $120.00 per share. They were

also required to pay the broker's fee, which they did by transferring to him thirty shares of their stock, and to secure loans for the Crook Company, or some of its original stockholders, to the amount of $50,000.00, and as part of the terms of sale the McLean Contracting Company had to subscribe to the stock of the Crook Company to the amount of $20,400.00 at $120.00 per share.

Miss Josephine married Mr. Dall in July, 1917, and for some time thereafter he and Mr. Maloy were on very friendly terms. He frequently visited Mr. Maloy's office and got Mr. Maloy to get him an abstract of the title of the several lots in which Mrs. Dall was interested. Later in the fall of 1917, however, whether prompted by a desire to raise some money on her lease, as suggested by some of the evidence, or by a natural interest in his wife's affairs, he began to inquire into the terms of the contract of December, 1916, and as he and Mr. Maloy and the other parties interested could not agree as to the construction of that agreement he determined to employ counsel, and in December, 1917, employed Mr. Charles H. Merillat of Washington, D. C., who gave him a written opinion about January 3rd, 1918, that the ground rent was not properly secured and that Mrs. Dall and George McLean had been unfairly dealt with. Mr. Dall had suggested that Mrs. Dall, having had six shares of the stock of the Contracting Company more than George had, and George's drawing account with the Contracting Company having been larger than her's, she was entitled to more of the ground rent. Mr. Maloy had mentioned that at the time of the agreement of December, 1916, and the understanding was that it would be fixed later, as George did not want to pay it out of his principal and preferred to pay it out of his income. After Mr. Dall called attention to it the matter was adjusted by George giving Mrs. Dall his note for the amount agreed upon. When Mr. Maloy secured the abstract of title for Mr. Dall, Mr. Fairbank suggested to him that there was some doubt in his opinion about the ground rent being redeemable at five per cent., and in December Mr. Maloy told Mr. Dall

about it and offered to get Mr. Crook of the Crook Company
to adjust it by an issue of bonds as a first lien on the prop-
erties, subject of course, to the original underlying ground
rent redeemable at $65,000.00. Mr. Crook consented to do
it and Mr. Dall in December approved of the plan, but later
Mr. Merillat advised against it because, as he said, the
ground rent was the best kind of security for a woman to
have, and in his judgment the ground rent of $10,000.00
could not under the law be redeemed for less than $200,-
000.00. On January 12th, 1918, Mr. Maloy met Mr. Meril-
lat for the first time at the Belvedere Hotel, where he went
at the request of Mr. and Mrs. Dall to talk over the whole
situation with Mr. Merillat and them. In that interview the
value of the several properties was fully discussed, as was
also the fact that the lease of lot D to secure $20,000.00 in
lieu of the notes of the Contracting Company had not been
placed in the safe deposit box, and a few days later Mr.
Maloy wrote Mr. Merillat what he understood he desired and
was agreed at that interview should be done in order to make
everything satisfactory to him and his clients. In reply to
that letter Mr. Merillat wrote him there had been no under-
standing between them, and demanding that he, Mr. Cob-
lentz, Mr. Brady and Mr. Donald McLean comply at once
with the terms of the agreement of December, 1916, by plac-
ing in the safe deposit box the securities therein mentioned
or, in lieu thereof, that they redeem the underlying ground
rent redeemable at $65,000.00, notwithstanding he knew that
lot D had been sold with the consent of his clients and the
equivalent of the proposed lease of lot D had been invested
and the securities placed in the safe deposit box, and not-
withstanding, too, Mr. Maloy had offered, pending the re-
demption of the ground rent capitalized at $65,000.00 in
June, 1918, to put additional securities in the box. In a
later letter of January 26, 1918, to Mr. Maloy he said: "I
call on you to comply with your contract according to its let-
ter without further delay. This call includes of course a

demand on your associates as well as yourself." In the meantime the owner of the fee in lot G agreed to accept the $65,000.00 for the ground rent in March instead of June, and to avoid further controversy it was accordingly paid and proper deeds given, and Mr. Maloy and those interested with him assumed that all differences between them and Mrs. Dall and George were at an end. But, it appears, without the knowledge of Mr. Maloy or others concerned with him, Mrs. Dall and George, at the instance of Mr. Merillat, had, on the 28th of January, 1918, retained Mr. Marbury with the view of attacking the validity of the several agreements mentioned and holding Mr. Maloy and others concerned with him accountable for profits supposed to have been received, and that Mr. Merillat's purpose had been not to disclose their plan until after he had compelled Mr. Maloy and his associates to redeem the ground rent redeemable at $65,000.00 in advance of the time they were required to do so under the contract of June 26th. Almost immediately after the ground rent was paid Mrs. McLean was approached for the purpose of having her join Mrs. Dall and George in a suit against Mr. Maloy and others, including Mr. Knapp, but she refused to do so, and shortly thereafter the draft of a bill to be filed in the United States District Court was prepared by Mr. Merillat. The bill was against the defendants in this case and Mr. Knapp, broadly charging them with fraudulent management of the estate and fraudulent obtention of the plaintiffs' properties, and was delivered by Mr. Merillat to Mr. Marbury and by him handed to Mr. Knapp for his consideration and the consideration of the other defendants. Months of interviews between counsel for the respective parties ending in the filing of the bill of complaint in this case, February 15th, 1919, in Circuit Court No. 2 in Baltimore City, by Mrs. Dall and George McLean against Mr. Maloy, in his own right and as administrator, Mr. Brady, Mr. Donald McLean, Mr. Coblentz and the McLean Contracting Company, leaving out Mr. Knapp, to have the agreements of Sep-

tember 6th and December, 1916, and the agreement of June 26th, 1917, declared void, and to require the defendants to account for all property and money received by them through or by means of said agreements. It would seem from some of the occurrences during the trial in the Court below that the attitude of at least one of counsel for plaintiffs was that the proceedings did not involve a charge of intentional wrongdoing on the part of Mr. Maloy or Mr. Brady, but the averments of the bill hardly admit of that construction. The evidence was taken before the Court and occupied the attention of the Chancellor for several months, and the learned judge who saw the witnesses and heard the evidence, after careful consideration, reached the conclusion that Mr. Maloy and Mr. Knapp discharged their duties "with diligence and great skill"; that the agreement of September 6th "was in all respects fair and to the advantage of the plaintiffs as well as to the other parties thereto," and that "in all negotiations leading up to the execution of said agreement, Messrs. Maloy and Brady advised the plaintiffs with fidelity and to the best of their ability," and that in respect to the agreement of December, 1916, the plaintiffs were well posted as to all their property, and were desirous of making the disposition thereof set forth in said agreement; that they were aware of the interest Mr. Maloy and Mr. Brady were to have in the Wharf Company, and believed, as did Mr. Maloy and Mr. Brady, that their participation in the company was necessary to obtain the terms set forth in the agreement, and to carry out the obligations of the company thereunder, and that in December, 1916, the sum of $200,000.00 was a fair valuation of all the property included in that agreement. The Court said further that but for the fact that the ground rent reserved in the lease of January 3rd, 1916, was "unmerchantable" the bill would be dismissed, but that he deemed it his duty to retain the bill for fifteen days, in order that the defendants might either cause the lease to be reformed so as to conform with the agreement of December,

1916, or cause to be exercised any of the options mentioned in said agreement, or make any other settlement acceptable to both parties to the cause.

After the opinion of the Court below was filed the defendants, in accordance with their prior offers to remedy any defect as to the redemption price of the ground rent reserved in the lease of January 3rd, 1917, procured from the H. E. Crook Company an offer in writing to the plaintiffs to give them in full payment of the ground rent the entire issue of $200,000.00 five per cent. bonds secured by a first mortgage or lien on the property covered by the lease, or, if they preferred it, to cause the lease to be reformed so as to comply with the provisions of the Act of 1914, Chapter 371. At the same time the defendants offered in writing to purchase from the plaintiffs the ground rent at and for the sum of $200,000.00, or to pay into Court, to be deposited by the clerk in a bank or trust company, subject to the order of the Court, $33,333.33 until January 3rd, 1922, to be returned to the plaintiffs if the ground rent was redeemed on or before that date and if the ground rent should not be redeemed within that time, the said sum to be paid to the plaintiffs, or their assigns, on the execution and delivery of a proper instrument making the rent reserved in the lease thereafter redeemable at six per cent. or $166,666.67.; said offer to remain open until thirty days after a final decree in the case, "or in the event of an appeal, until thirty days after the opinion of the Court of Appeals is filed," or, if they prefer it, to immediately pay to them $33,333.33, less interest thereon at five per cent. until January 3rd, 1922, provided they executed a proper instrument reducing the redemption price of the rent reserved in the lease of January 3rd, 1917, for $200,000.00 to $166,666.66. These offers having been refused by the plaintiffs, the Court below, on petition filed setting forth said offers and refusal to accept same, dismissed the bill of complaint, and from its decree this appeal was taken.

The pleadings and evidence in the case cover nearly twenty-four hundred pages of the printed record, and we have stated the case at unusual length because in our view it demonstrates the soundness of the conclusion reached by the Court below.

Mr. Maloy and Mr. Brady had no interest in the contract of September 6th, 1916, adverse to the interests of their clients, and there is no force in the suggestion that their position as counsel for the plaintiffs was compromised by the mere fact that the Contracting Company consented to pay a part of their fees. The very successful work that they and Mr. Knapp had done in connection with the agreements with the city and the railroad company, and their efforts to preserve the Contracting Company, inured to the benefit of the company as well as the estate, and Mrs. McLean was justified in exacting, as part of the consideration for disposing of her stock and interest in lot D, an undertaking on the part of the company to relieve the estate in which she was interested of a part of those fees.

The contract of December, 1916, presents a different question. The evidence to which we have referred, as well as the other evidence in the case, all of which has been carefully examined and considered, shows conclusively that the plaintiffs knew exactly what property they had and were entitled to after the settlements with the city and railroad company, the statement of the final account and their acquisition of Mr. McLean's interest, as well as the amount they owed the estate. They knew the condition of each property and fully realized and appreciated the burden they would assume and the risk they would run in undertaking to carry them. They knew certainly as early as December 11th that the proposition they elected to consider involved the transfer of all their interest in the several lots, the notes of Mr. Coblentz and Mr. Donald McLean and the Contracting Company, their contingent interest in lot D and all their shares of stock, except the stock of the Boston Sand & Gravel Com-

pany, in consideration of a fixed income of from $4,000.00 to $5,000.00 for each of them. They also knew as early as December 15th that Mr. Maloy and Mr. Brady were to be interested, directly or indirectly, as purchasers of the property, and knew on the day the agreement of December, 1916, was executed that they were to be stockholders of the Wharf Company therein mentioned, and the reasons why they were to be connected with it. Mrs. Dall in her examination in chief at first denied having such knowledge, but, apart from the testimony as to what occured on the day the agreement was made, and other convincing evidence, her subsequent statements on cross-examination show that she did know it. For instance, she states that Mr. Maloy told her in the winter of 1917 that he and Mr. Brady each had $5,000.00 of the stock of the Wharf Company, whereas they only had, or agreed to subscribe for, $3,000.00 of the stock, and the statement of Mr. Maloy referred to must have been made to her in the conversation of December 15th, which she admittedly had, at which time Mr. Maloy and Mr. Brady had agreed, subject to the consent and approval of the plaintiffs, to take $5,000.00 of the stock of the company then proposed to be formed with a capital stock of $20,000.00 for the purpose of taking the property and making the extensive improvements that would be required by the Garland Steamship Company. The plaintiffs, ignoring Mr. Maloy's telegram, came to Baltimore on December 27th with a fixed purpose and determination to close immediately an arrangement by which they were to dispose of all their property, except the Boston Sand & Gravel Company stock referred to, in order to secure the much desired permanent incomes, and the only question still open in their minds was the amount of income they could get. When they signed the agreement of December, 1916, they fully understood that they were parting with their said property in consideration of an annual ground rent of $10,000.00, redeemable at $200,000.00, to be reserved in a lease of lots E, F and G to the Wharf Company,

and to be further secured by said notes, stock in the Contracting Company and contingent interest in lot D as collateral, and they executed the agreement knowingly, advisedly and deliberately. The great and convincing weight of the evidence further shows that the plaintiffs, under the agreement of December, 1916, got for their property its full value at that time, and more than they could probably have gotten from any other person or company. Mr. Caughy, Mr. Steffey, Mr. Merriken, Mr. Ferguson and Mr. Lindsey, real estate experts of long experience, who were familiar with lots E, F and G, and whose conclusions were reached not for the purpose of this case, but in connection with valuations arrived at by them just prior to December, 1916, placed the value of these lots, in fee simple, in December, 1916, at from about $133,000.00 to $143,000.00, and JUDGE TRIPPE testified that the Appeal Tax Court made a careful revaluation of these lots in the fall of 1917, and the evidence shows that as the result of that revaluation the total value of the lots, for land and improvements, was fixed at $104,009.00. In addition to these estimates we have the testimony of these gentlemen to the effect that there was no demand for these lots in December, 1916, and the evidence of Mr. Maloy and others of repeated efforts to sell them without getting an offer for them, notwithstanding they were in the hands of a number of real estate agents for sale. The one real estate expert produced by the plaintiffs placed a higher value on the lots, and stated the value of lot G, in fee simple, to be $118,000.00, although in June, 1916, before a part of that lot was sold to the Baltimore and Ohio Railroad Company for about $38,000.00, at the request of a proposed purchaser, he valued the entire lot, in fee simple, at $107,250.00. If we deduct from the $143,000.00, the highest value reached by either Mr. Caughy, Mr. Steffey, Mr. Merriken, Mr. Ferguson, Mr. Lindsey or the Appeal Tax Court, the $65,000.00 necessary to redeem the ground rent on lot G, we have $78,-000.00 left as the value of the plaintiffs' interest in lots E,

F and G, without making any allowance for the depreciating effect of the obligations under the lease to the Coastwise Company, and if we add to this value of their interest in the lots the value of the notes and stock disposed of under the agreement of December, 1916, amounting to about $62,626.00, we have $140,626.00 as the total value of the property for which they received an annual ground rent of $10,000.00 redeemable at $200,000.00. So that the plaintiffs not only deliberately entered into the contract with full knowledge that they were disposing of all the property therein mentioned for the ground rent therein provided for, but they received for that property much more than its market value, and more than they could probably have gotten otherwise, provided the agreement was fully performed by the Warehouse Company.

Although what we have said is clearly established by the evidence, nevertheless the plaintiffs entrusted Mr. Maloy and Mr. Brady with, and they with that knowledge undertook, the preparation of the agreement so as to carry out the understanding of the parties and to protect their interest, and the rule applicable to such cases is nowhere more rigidly enforced than in this State. In the case of *Cumb. C. & I. Co.* v. *Sherman*, 20 Md. 117, the Court, after stating the rule applicable to trustees, said: "This doctrine which is applicable to trustees, applies also to purchases, by persons acting in any fiduciary capacity, which imposes upon them the obligation of obtaining the best terms for the vendor, or which has enabled them to acquire a knowledge of the property." In *Payne* v. *Avery*, 21 Mich. 524, JUDGE COOLEY said: "We think, relying upon Avery being such a man, Payne, with Avery's full knowledge and concurrence, entrusted him to draw up all the papers between them, and that in doing so, and in all the conversations relating thereto, Avery occupied the two-fold and very difficult position of purchaser and confidential legal adviser, and was bound to observe the utmost good faith towards Payne, and not only to abstain from any deception and overreaching, but to draft all papers with suffi-

cient care and professional skill to make them express the real understanding and agreement of the parties, so far as was essential to the protection of Payne's interest." In the case of *Roman* v. *Mali*, 42 Md. 513, JUDGE ALVEY said: "In order, however, to avoid all possible misapprehension upon the subject, we deem it proper to state, that the general rule governing transactions between client and attorney is in no manner designed to be questioned, or in the slightest manner qualified or impaired by the decision of this case. Over such transactions courts of equity exercise the most exact scrutiny, and are always disposed to view them with more than ordinary jealousy. But in this case, the simple fact that Roman was an attorney can make no difference in considering the transactions between himself and Mali; and even if it be conceded that the relation of client and attorney existed between them, the rule does not go the length of absolutely avoiding transactions between parties standing in that relation. The attorney is under no actual incapacity to deal with or purchase from his client. All that can be required is, that there has been no abuse of the confidence reposed; no imposition or undue influence practiced, nor any unconscionable advantage taken by the attorney of the client. When a transaction between parties occupying such relation to each other is brought in question, the onus of the case is cast upon the attorney of showing that nothing has happened in the course of the dealing which might not have happened had no such connection subsisted, and that the transaction has been fair in all respects. If the Court be satisfied that the party holding the relation of client performed the act or entered into the transaction voluntarily, deliberately and advisedly, knowing its nature and effect, and that no concealment or undue means were used to obtain his consent to what was done, the transaction will be maintained. Such is the rule as deduced from the best considered cases upon the subject, and which is said to be dictated from motives of public policy." See also *Merryman* v. *Euler*, 59 Md. 588;

*Williams* v. *Williams,* 63 Md. 371, and *Etzel* v. *Duncan,* 112 Md. 346, which show that the rule so clearly stated in the opinions quoted has never been departed from or qualified in this State. Now the evidence shows that the Warehouse Company, one of the parties to the agreement of December, 1916, was not incorporated until the 29th or 30th of December, and there is no evidence to show that the capital stock of the company was subscribed or paid for until some time after the agreement and lease were executed, and there was no obligation, under the written agreement, on the part of any of the appellees to incorporate the company or to take and pay for its capital stock. If therefore the agreement was signed by the appellants on the 28th the other party to the contract was not in existence at the time they executed it, and at the time the lease was executed the company had no subscriptions to its capital stock. It is no answer to say that the appellants, upon the failure or refusal of the company to secure the required subscriptions, could have recovered back their property, because that would have been attended with both expense and delay. Again the nineteenth paragraph stipulated that the company should hold free from the pledge any of the securities in the safe deposit box to an amount equal to the amount the company might spend for improvements over and above the $12,000.00, without any provision for the protection of the appellants so far as the nature of the improvements were concerned. In these particulars at least, as well as the failure to provide for a lease redeemable under the Act of 1914 at not less than $200,-000.00, the agreement was, in the opinion of the Court, defective in that it did not properly protect the rights the appellants expected and were intended to acquire under the contract. While, therefore, the evidence in the case completely exonerates the appellees from any wilful fraudulent act or omission, or any intentional wrongdoing, and the defects referred to are doubtless attributable to the apparent haste in which the agreement was prepared, if the contract was still

open and unperformed and a suit was brought by the appellants to set it aside, or by the appellees to enforce it, it would be difficult to sustain the agreement under the strict rule referred to, and the case would furnish an example of the danger of participating in transactions which the law discourages, and an illustration of the wisdom of a rule based upon sound public policy. But the situation here is different. Fortunately the appellants were dealing with honest and capable men, who, instead of taking advantage of any of the defects in the agreement, faithfully performed, or offered to perform, every obligation assumed by the company or by them, as they and the appellants understood them and intended them to be, and who at every step in the subsequent transactions were careful to make more secure the rights the appellants acquired under the agreement, and as the result the appellants have received more than they contracted for, namely, an annual ground rent of $10,000.00, which the appellants offered to redeem or to make redeemable at $200,-000.00, secured by a *first lien* on property upon which more than $60,000.00 has been spent in permanent improvements, and for which ground rent they gave property worth at the date of the agreement not more than $140,626.00. In addition to this feature of the case, the appellants not only executed the lease of January 3rd, 1917, but after they admittedly knew that Mr. Maloy and Mr. Brady were stockholders of the Warehouse Company, they executed the agreements of June 26th, continued to accept the rent, and after they employed counsel and were fully advised of all their rights, they forced the appellees to redeem the underlying ground rent of $65,000.00 in order to make more secure the ground rent they acquired under and in pursuance of the agreement of December, 1916, without intimating or disclosing to the appellees any intention on their part to dispute the validity of that agreement. Under such circumstances they must be held to have ratified the agreement and to be estopped from questioning its validity. In the case of

*Browne* v. *M. E. Church*, 37 Md. 108, the Court said: "The principle is this, where one stands by and sees another laying out money upon property, to which he has some claim or title, and does not give notice of it, he cannot afterwards, in good conscience, set up such claim or title." How much stronger is the case where one not only stands by and sees another laying out money upon the faith of an agreement, but who also exacts strict performance of it while secretly intending to deny its validity. And in the case of *Carmine* v. *Bowen*, 104 Md. 198, CHIEF JUDGE McSHERRY said: "Where a person with actual or constructive knowledge of the facts induces another by his words or conduct to believe that he acquiesces in or ratifies a transaction, or that he will offer no opposition thereto, and that other, in reliance on such belief, alters his position, such person is estopped from repudiating the transaction to the other's prejudice." Learned counsel for the appellants rely upon the case of *Hoffman Coal Co.* v. *Cumb. C. & I. Co.*, 16 Md. 456, where the Court said: "The law governing questions of ratification, in cases like the present, is well settled. To render the act of ratification effective, and conclusive, certain considerations are necessary. At the time of the supposed ratification, the principal must have been *fully* aware of every material circumstance of the transaction, the real value of the subject of the contract, and his act of ratification must have been an independent and substantive act, founded on complete information, and of perfect freedom of volition. And, in addition to all this, the *cestui que trust* must not only have been acquainted with the facts, *but apprised of the law, how those facts would be dealt with if brought before a court of equity.*" Assuming that the limitations of the rule as stated are applicable to the facts of this case, and that the defense mentioned rests entirely upon the doctrine of ratification, the evidence in the record brings the case clearly within the requirements. There is no question but that the appellants knew, at the time they compelled the payment of the $65,000.00 ground rent, all

the facts necessary to give full effect to their act. They had counsel who had carefully investigated the circumstances under which the contract was executed, and who had advised them of their rights, and "how the facts (as they stated and alleged them to be) would be dealt with if brought before a court of equity," and they had also been advised by counsel that what they had done, and what they were then doing, did not amount to a ratification of the agreement.

Without intending to qualify in any respect the rule applicable to dealings between attorney and client, which this Court has ever jealously enforced, we must hold for the reasons stated that the appellants are not in a position entitling them to the relief asked for, and affirm the decree of the Court below which dismissed their bill of complaint.

*Decree affirmed, with costs.*