### KEYWORTH *v.* ISRAELSON ET AL.

[No. 404, September Term, 1964.]

*Decided November 8, 1965.*

The cause was argued before PRESCOTT, C. J., and HORNEY, MARBURY, OPPENHEIMER and BARNES, JJ.

*Paul Berman,* with whom was *Bayard Z. Hochberg* on the brief, for the appellant.

*J. Cookman Boyd, Jr.,* with whom was *Walter S. Levin* on the brief, for Max R. Israelson and Stafford H. Plimack, two of the appellees.

*Delverne A. Dressel,* with whom was *Emanuel H. Horn* on the brief, for Industrial Sales Co., Inc., the other appellee.

OPPENHEIMER, J., delivered the opinion of the Court.

This appeal involves the rights of attorneys and client in a settlement fund under a fee agreement and the right of a creditor of the client to an equitable lien against the fund. The client, Charles E. Keyworth (Keyworth) has appealed from an order of the Circuit Court No. 2 of Baltimore City directing that one-third of the fund (after expenses and costs) be paid to the attorneys, Max R. Israelson (Israelson) and Stafford H. Plimack (Plimack) and from a decree of that court ordering the amount advanced to Keyworth by his employer, Industrial Sales Co., Inc. (the Employer) retained from the proceeds of the fund pending the final determination of a law suit between the Employer and Keyworth.

On September 29, 1959, Keyworth, while in the employ of the Employer, sustained serious injuries when an automobile which he was operating in the course and scope of his employment was struck by a truck operated by Stephen Brown while on business of Brown's employer, Fleet Transfer Company. Some three days after the collision, Plimack who, it is claimed, was the attorney for the Employer, came to see Keyworth and was employed by him, under circumstances to which reference will be made hereafter. Keyworth and his wife signed an agreement under which Plimack undertook to represent the Keyworths in connection with their claim against Brown and Fleet Transfer Company. This agreement provided for a fee to Plimack of twenty-five per cent of any amount received, if the case were to be settled out of court, and one-third of any recovery in litigation. On October 10, 1959, Keyworth executed a claim for compensation, which was filed for him by Plimack with the Maryland Workmen's Compensation Commission on October 16, 1959. On November 9, 1959, the Commission ordered that Keyworth receive temporary total disability benefits of $40 a week, which he received from the date of the injury through June 19, 1960. He also received temporary partial disability benefits from June 20, 1961 through September 24, 1961, and medical and hospital expenses under the Employer's compensation insurance. The temporary total and temporary partial disability benefits amounted to $3201.43, and the

medical and hospital expenses totaled $1030. While Plimack had requested a hearing on behalf of Keyworth to determine the nature and extent of permanent disability, no hearing was held on this issue until April 21, 1964, after Keyworth's present counsel had entered the case and Plimack's name, at Keyworth's request, had been removed as Keyworth's attorney from the compensation proceedings. On April 27, 1964, the Commission found that Keyworth had sustained a permanent partial disability under "Other Cases" amounting to fifty per cent industrial loss of the use of his body and ordered compensation at the rate of $25 a week beginning September 25, 1960, not to exceed the sum of $6250. The Employer and its insurer, in another case, have appealed this order of the Commission.

On March 8, 1960, Plimack filed suit on behalf of Keyworth against Brown and Fleet Transfer Company as third-party tortfeasors. On May 28, 1962, on Plimack's recommendation, Keyworth agreed to employ both Plimack and Israelson as his attorneys to try this case. This agreement expressly provided that it superseded the original fee agreement between Keyworth and Plimack. Under the 1962 agreement, Keyworth authorized Plimack and Israelson to carry on the suit or compromise it and agreed to pay them one-third of the amount recovered; he also authorized the attorneys to pay the necessary medical and hospital and other expenses out of his share of any recovery.

The trial of the third-party case concluded on December 3, 1962 and resulted in a jury verdict in Keyworth's favor for $15,000, an amount which was disappointingly low to Keyworth and his attorneys. It is agreed that the main reason for what is claimed to be the relatively small judgment was that the defendants produced and showed motion picture films depicting Keyworth's movements prior to the trial, which contradicted Keyworth's claims of disability resulting from the collision.

An appeal was immediately discussed, a motion for a new trial was made and denied, and Israelson ordered the transcript written up. In February, 1963, Keyworth raised and gave to Israelson the necessary monies to perfect the appeal. Israelson was pessimistic as to the chances on appeal. Keyworth was convinced there was something wrong with the films. Israelson obtained an offer of an additional $1600 to settle the

appeal. Israelson contends, and Keyworth denies, that Keyworth authorized the dismissal of the appeal in view of the offer totalling $16,600.

Keyworth refused to sign the settlement papers and Israelson filed an order with the court clerk to have the judgment entered to his and Plimack's use to the extent of the agreed fee, in accordance with the express authorization contained in the fee agreement of May 28, 1962, and a judgment was entered to their use to the extent of their one-third attorney's fees. Thereafter, Israelson and Plimack petitioned for the appointment of a trustee to execute settlement papers and to hold and disburse the funds and, after an answer had been filed by Keyworth, the case was transferred by consent to the Circuit Court No. 2 of Baltimore City and an order signed appointing the clerk of that court trustee to hold the settlement fund subject to further order.

On December 31, 1959, the Employer and Keyworth entered into an agreement which recited that while Keyworth was then receiving $40 a week under the Commission's order of November 9, 1959 as compensation for temporary total disability, he had been earning approximately $100 a week take-home pay and wished to receive weekly advances from the Employer in the amount of $100. The agreement, which was prepared by Plimack, provided that the Employer would pay Keyworth $100 a week from the time of the accident until he returned to work on a full-time basis; that Keyworth would maintain his suit against Brown and the Fleet Transfer Company through his attorney, Plimack, and that, upon the successful conclusion of the case, he authorized Plimack to issue a check to the Employer for the amount to be advanced by the Employer, excluding any bonuses or presents. The Employer made advances to Keyworth under this agreement in the total amount of $7200. After the court below had appointed the clerk as trustee of the sum of $16,600, the Employer filed a petition in the proceedings alleging that the sum on deposit was subject to an assignment-lien in its favor in the amount of $7200 under its agreement with Keyworth and asking that the court order payment of this sum to the Employer out of the fund. Keyworth answered this petition denying that the Employer was entitled to the re-

lief it prayed; the Employer thereupon filed a petition to intervene and was authorized to do so on September 23, 1964. On September 11, 1964, the date the Employer filed its petition to intervene in the proceedings in the Circuit Court No. 2, it filed a lawsuit against Keyworth in the Baltimore City Court for the sum of $7200 under its agreement, asking for summary judgment.

After the taking of testimony and the filing of an opinion, Judge Harris, in the court below, entered an order, on October 14, 1964, awarding to Israelson and Plimack a one-third fee of the $16,600, less the cost of the transcript and the cost of the appeal, in the net amount of $5292.12. The order also awarded to the Employer's compensation carrier the sum of $2697.41, representing its lien of $4231.43 less its proportionate share of approximately twenty-five per cent chargeable under Code (1957), Article 101, Section 58, and ordered $7200 held in escrow pending the outcome of the civil action brought by the Employer against Keyworth in the Baltimore City Court. The order awarded Keyworth $723.65 as reimbursement for costs advanced and provided that the balance of the fund, $668.82, be held in escrow pending the outcome of the compensation appeal with respect to the award of permanent partial disability. Judge Harris had also provided for the retention of the sum of $7200 pending the final determination of the suit of the Employer against Keyworth in his decree dated October 9, 1964.

Keyworth's first contention is, that the lower court erred in awarding any counsel fee to Plimack and Israelson because they had dismissed the appeal in the third-party case without Keyworth's consent. He contends, second, that, in any event, the fee should be substantially reduced because Keyworth's compensation remedies had not been prosecuted to conclusion before the third-party action was tried and that, if he had received his award for permanent partial disability before the trial, there would have been a substantial benefit to him as to the amount of fees to be charged against him out of the fund. Third, Keyworth contends that the lower court erred in retaining the $7200 from the proceeds of recovery pending final determination of the law action brought by the Employer against Keyworth, because there was no equitable lien.

## I

In this appeal from the order of the Chancellor, Keyworth first contends that Plimack and Israelson should have been allowed no counsel fee whatsoever because they dismissed the appeal from the judgment in the third-party case against Brown and Fleet Transfer Company contrary to Keyworth's express instructions. Keyworth recognizes that the issue here involved is entirely one of fact. He recognizes, further, the purport of Maryland Rule 886 a. that when an action has been tried by a lower court without a jury, the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses. Keyworth argues, however, that on the issue here involved, in the light of the testimony, the finding of the lower court was clearly erroneous.

To support his contention, Keyworth relies on various aspects of the testimony. He points to the undisputed fact that, despite Israelson's feeling that the appeal was weak, he, Keyworth, wrote a formal letter to Israelson on July 1, 1963 stating that "[a]fter serious deliberation, I *insist* that you continue with the appeal." Despite this letter, Israelson testified that his alleged authority from Keyworth to dismiss the appeal was given in a telephone conversation in the first week of September and that he, Israelson, had no written memorandum in his file to indicate when the final authorization was given and did not confirm the alleged conversation by letter. Keyworth had consulted a film expert, in an endeavor to show distortion in the moving pictures which proved so disastrous at the trial to Keyworth's claim of disability, and had received a written report from the expert as late as August 23, 1963 which confirmed his suspicions about the film. Keyworth stresses some inconsistencies in the testimony of Israelson as to the extent and manner in which Israelson consulted Melvin Sykes, a highly respected member of the bar who does much appellate work, as to the chances on appeal and Sykes' own recollection of what transpired. To rebut Israelson's testimony that he was always faced with the spectre of a new trial in which Keyworth might get less, Keyworth points to the fact that, as a result of the order of the lower court, without a new trial, he will get nothing

in any event. Keyworth refers to other phases of the testimony to support his contention that the dismissal of the appeal by Israelson was clearly unauthorized, was an act of bad faith in the performance of his professional duties to his personal advantage to save the necessity of further endeavor and that, therefore, neither Israelson nor Plimack is entitled to any compensation for their services.

In his opinion, Judge Harris reviewed and analyzed the conflicting testimony as to whether or not Keyworth had authorized the dismissal of the appeal. He referred to Keyworth's testimony that, after Israelson had told him in June, 1963 that the chances of success on the appeal, in his opinion, were slight, he, Keyworth, talked to a number of "influential people" concerning the appeal, but, when pressed on recross-examination as to the identity of the persons to whom he had talked, his testimony was extremely vague and, to Judge Harris, unconvincing. The judge was impressed by the fact that if Keyworth was unable to recall the identity of any of the "influential people" with whom he discussed his case during the summer of 1963 (apart from his present counsel), it is probable that he could not accurately recall the details of his telephone conversation with Israelson in September, 1963. The judge had examined the transcript of the trial in the third-party case and referred to the fact that Israelson is "an experienced, skilled, and reputable trial attorney of known ability in personal injury negligence cases" and found that an examination of the transcript and the actions taken by Israelson following the trial showed no evidence of any malpractice on his part. As to Israelson's consultation with Sykes and Israelson's alleged failure to show Sykes a part of the transcript containing alleged erroneous trial rulings in the refusal to allow Keyworth to testify in rebuttal on the motion pictures, Judge Harris pointed out that Israelson, was under no obligation to consult Sykes in the first place and that, at the most, it is debatable as to whether Israelson should have shown Sykes the portion of the transcript which Keyworth contends was important. Sykes had testified he could not give any advice as to the merit of the appeal without some prior legal research. Judge Harris stressed the fact that Israelson, in good faith, did seek to obtain "an

objective, expert appraisal of the chances of the appeal's success, when he was under no duty to do so."

We have examined the entire record extract in the light of Keyworth's contentions. In our opinion, the findings of Judge Harris that Israelson had properly performed his professional duties in the conduct of the trial and thereafter and that Keyworth had expressly authorized Israelson to dismiss the appeal are not clearly erroneous and, therefore, will not be set aside.

## II

Keyworth contends that even if this Court finds, as it has, that the lower court was not clearly in error in holding that Keyworth authorized the dismissal of the appeal, nevertheless the amount of the fee allowed to Plimack and Israelson should be reduced because of their alleged failure to prosecute Keyworth's compensation remedies to a conclusion before trying the third-party action against Brown and Fleet Transfer Company. Keyworth argues that, if Plimack or Israelson had caused Keyworth's claim to compensation for permanent partial disability to be heard before the Workmen's Compensation Commission and an award made before the trying of the third-party action, then the resulting fees to Israelson and Plimack would have been less and the benefit to Keyworth substantially greater. This contention is based upon an alleged conflict of interest as well as failure to perform professional duties.

Keyworth testified in the proceedings below, without contradiction, that after his accident he employed Plimack as his attorney because of the insistence of the Employer. He stated that he talked with Mr. Louis Schloss, the president of the Employer, on the telephone after the accident and it was agreed that Keyworth needed an attorney and Schloss said he would send his attorney down. Judge Harris accepted as a fact that Keyworth employed Plimack on the insistence of the Employer.

Keyworth testified that when Plimack came to see him at his home, about three days after the accident, Plimack said that "he would take care of the compensation bit." In fact, on October 10, 1959, about two weeks after the accident, Keyworth executed a claim for compensation, which was filed by Plimack as Keyworth's attorney, with the Maryland Work-

men's Compensation Commission on October 16, 1959. Plimack immediately requested a hearing before the Commission on behalf of Keyworth to determine the nature and extent of permanent disability. The order of the Commission for the payment of temporary total disability to Keyworth at $40 a week was passed on November 9, 1959; Plimack did not press any claim for counsel fee for the securing of this order or the payment of medical expenses. The Commission advised Plimack on May 14, 1962 that Keyworth's case was set for hearing on the nature and extent of permanent disability on May 25th but the file of the Commission, which was made part of the record below, shows that the hearing was postponed and the file was noted on May 24, 1962 "Do not reset until requested." The hearing on the claim for permanent partial disability was not held until April 21, 1964 when Keyworth was represented by his present counsel; as a result of this hearing, Keyworth received a total of $6250 additional compensation.

At the hearing before Judge Harris, counsel for Keyworth made the following proffer in connection with this phase of the case:

> "I want to show that Mr. Keyworth employed Mr. Plimack at the insistence of his employer, that was obvious conflict of interest. Mr. Plimack was the employer's lawyer and representing Mr. Keyworth.
>
> Now, he did file a claim for compensation and was paid some compensation for some period. The conflict was very apparent because rather than permit Mr. Keyworth to get his compensation, all the compensation to which he was entitled, which might have increased his employer's insurance premium because of the loss ratio, Mr. Plimack elected on his own to file suit on behalf of Mr. Keyworth. And although the records will show, the records of the commission will show the case was set for a hearing on numerous occasions to determine the nature and extent of Mr. Keyworth's injury whereby he would get an award for permanent partial, the obtaining of which would cost him a whole lot less in counsel fees than it would

> be by obtaining it in the third party suit, Mr. Pli-
> mack misrepresented this man in so doing, that is in
> continuing those hearings and not pursuing the hear-
> ings before the commission, and letting it go to trial
> against the third party proceeding."

The trial judge did not permit Keyworth to offer testimony pursuant to the proffer because it related largely to conversations between Keyworth and Plimack out of the hearing of Israelson and prior to the time that Israelson had been employed by Keyworth.

Under the provisions of Code (1964 Repl. Vol.) Article 101, Section 58, when there is an injury for which compensation is payable under the Article, caused by circumstances creating a legal liability in a third person, and there is a recovery against the third person, the employer and his insurance company have a right to be reimbursed for compensation paid or awarded and for any amounts paid for medical services, except court costs and counsel fees. Court costs and counsel fees are to be paid by the injured employee and his employer and the compensation insurance carrier in the proportion that the amount received by each shall bear to the whole amount paid in settlement or satisfaction of any judgment obtained in the case. Keyworth contends that, if his award for compensation for permanent partial disability had been made prior to the third-party litigation, the compensation insurer would have been chargeable with a larger share of Plimack's and Israelson's counsel fees and the court costs. The compensation insurer would have had to pay counsel fees and costs to cover its share of the supplemental award of April 27, 1964 which it would have received in subrogation against the money recovered from the third parties, in the same manner in which the Chancellor reduced the compensation insurer's reimbursement from the third-party settlement for its payments under the original award of November 9, 1959. Keyworth's net recovery, then, would have been increased by the additional amount that the compensation insurer would have contributed to the counsel fees and court costs. Keyworth requests that the Plimack-Israelson fee be reduced by such amount as the compensation insurer would have

contributed and Keyworth's share of the fund be increased *pro tanto*.

Plimack and Israelson deny that there was any conflict of interest in their representation and contend that the agreement between them and Keyworth of May 28, 1962 takes the place of any prior agreement, is unambiguous and supports the distribution of the fund ordered by the court below. In our opinion, however, the matter is not so clear, particularly in view of the ˙high fiduciary duties imposed upon attorneys in their relationship to their clients.

Canon 6 of the Canons of Professional and Judicial Ethics of the American Bar Association (1957), which is also Canon 6 of the Canons adopted by the Maryland State Bar Association, sets forth the fundamental concept that:

> It is the duty of a lawyer at the time of retainer to disclose to the client all the circumstances of his relations to the parties, and any interest in or connection with the controversy, which might influence the client in the selection of counsel.
>
> It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts * * *"

In the early case of *Zimmerman v. Bitner*, 79 Md. 115, 126 (1894), this Court said:

> "The broad principle, says Vice-Chancellor Wood, on which the court acts in cases of this description, is that wherever there exists such a confidence, of whatever character that confidence may be, as enables the person in whom confidence or trust is reposed, to exert influence over the person trusting, the court will not allow any transaction between the parties to stand, unless there has been the fullest and fairest explanation and communication of every particular resting in the breast of the one who seeks to establish a contract with the person so trusting him. *Tate v. Williamson*, L. R. 1 Eq. 528."

It is also true, however, that even when a transaction between

an attorney and his client is questioned, if the attorney can show that the client entered into the relationship voluntarily, deliberately and advisedly, knowing its nature and effect, and that there was no concealment of any kind or undue means used to obtain the client's consent, the transaction will be sustained. *McLean v. Maloy*, 136 Md. 467, 513, 111 Atl. 91 (1920). See also *Silverman v. Kogok*, 239 Md. 71, 76, 210 A. 2d 375 (1965).

In the hearing below, Keyworth testified that he was not at all familiar with proceedings before the Workmen's Compensation Commission. The record shows that proceedings were taken before the Commission by Plimack as Keyworth's attorney for temporary total disability payments after the original agreement as to fee between Keyworth and Plimack had been signed. There is nothing in the record to indicate Plimack's reasons for not proceeding with the hearing as to Keyworth's claim for compensation for permanent partial disability, or whether or not he explained such reasons to Keyworth.

It is undisputed that Plimack acted as counsel for both the Employer and Keyworth in the drawing of the agreement dated December 31, 1959 between the Employer and Keyworth, under which the Employer agreed to advance Keyworth $100 a week. No conflict is indicated, however, in Plimack acting for both parties in the drafting of this agreement. There was no legal obligation of any kind on the Employer to make the advances and the agreement expressly set forth that the $40 a week which Keyworth was receiving for temporary total disability was to remain his sole property except for any subrogational rights the insurance carrier might have.

The original written agreement as to compensation between Keyworth and Plimack, in terms, referred only to the third-party action. Keyworth's testimony that Plimack also agreed to "take care of the compensation bit" was not contradicted. Additional testimony may show the nature of the agreement as to Plimack's representation of Keyworth for claims for compensation. We think that the court below should have accepted the testimony proffered by Keyworth's counsel. The testimony was admissible to show Keyworth's loss, if any, caused by Plimack's failure to have had a prompt hearing on Keyworth's claim for

permanent partial disability. If there was such a loss to Keyworth, it was for the trial court to consider the effect on the proper amount of fee to be allowed. We do not agree that because Israelson entered the case at a later date he was necessarily absolved from any effect that the proffered testimony might have had on the relationship of the parties. It is true that the agreement of May 28, 1962 between Keyworth, as client, and Plimack and Israelson, as attorneys, expressly stated that it superseded the original agreement. It is also true that, as Plimack and Israelson contend, a court will not undertake to redraft a contract when its terms are plain and unambiguous. *Hankins v. Public Service Mutual Insurance Co.*, 192 Md. 68, 84, 63 A. 2d 606 (1949). However, in a confidential relationship such as that of attorney and client, the burden is upon the attorney to show a transaction as to fee is voluntary and fair. *Tucker v. Dudley*, 223 Md. 467, 473, 164 A. 2d 891 (1960); *McLean v. Maloy, supra*, 513. The rule is applicable when the attorney asserts his claim in an equity court to part of a fund paid into court. *Tucker v. Dudley, supra.* In determining whether an attorney has met the burden of proof which the law casts upon him, the court must consider all the facts and circumstances in the particular case. *Baker v. Otto*, 180 Md. 53, 56, 22 A. 2d 924 (1941).

It was at Plimack's suggestion, because of Israelson's experience and reputation as a trial attorney in actions for personal injuries, that Keyworth authorized Israelson's employment with Plimack in the third-party litigation. It may be that Keyworth would have been satisfied to pay an additional contingent fee to Israelson because of his reputation. It may also be, however, in the light of the additional testimony which we believe is indicated and all the facts and circumstances, that the second fee agreement is to be construed in the light of whatever understanding may be found to have existed at the time Keyworth first employed Plimack as to the prosecution of the proceedings before the Commission. There is also to be considered whether Israelson, on all the facts, was under a duty to make sure that Keyworth understood the possible effect on the agreed-upon fee of the failure to have obtained an award from the Commission for permanent partial disability before the trial of the third-party case.

In what we have said, we do not intend to reflect upon the professional conduct of the attorneys involved in these proceedings. It is our opinion, however, that in view of the fragmentary state of the record as to this aspect of the case and the duty of courts to insist upon the full compliance, in spirit as well as letter, with the high standards inherent in the carrying on of the legal profession, the purposes of justice will be advanced by providing for further proceedings, which would include the testimony of Plimack, in accordance with Maryland Rule 871 a.

### III

Keyworth contends that the lower court was in error in permitting the Employer to intervene in the proceedings; in its decree of October 9, 1964 providing that the clerk of the court retain the sum of $7200 pending the final determination of the lawsuit of the Employer against Keyworth; and in making a similar provision in its order of October 14, 1964. Keyworth submits that the agreement between the Employer and himself is no more than a contract, the breach of which would entitle the injured party to maintain a lawsuit for damages but that the agreement does not expressly or impliedly create a lien against the proceeds of the third-party action. The Employer argues that the clear intention of the agreement of December 31, 1959 was not only to make the contract but also to provide a lien against the fund, if and when created, and that the lower court was correct in its orders and decree.

An equitable lien is based on specific enforcement of a contract to assign property as security. The contract need not stipulate for the lien in express terms; it is enough if that is the fair and reasonable implication of the terms employed. A mere promise to pay a debt or obligation does not of itself, however, create a lien unless the intention to create it is apparent from the instrument and circumstances leading to it. *Johnson v. Johnson,* 40 Md. 189, 196 (1874). See 33 Am. Jur. *Liens* § 18 and 4 Pomeroy's *Equity Jurisprudence* §§ 1235-1237 (5th ed. 1941) ; but also see 41 Harv. L. Rev. 404 (1928).

In most cases involving the question of whether or not an equitable lien has been created, the rights of other creditors are involved, but the same principles apply when, as here, the

controversy is only between the original creditor and the debtor. The danger that the fund might be dissipated before the creditor is able to prove his right to recover at law does not, of itself, give a court of equity jurisdiction, if no lien has been created. See 33 Am. Jur. *Liens* § 6 and cases therein cited.

In *Johnson v. Johnson, supra,* the plaintiff and defendant had entered into an agreement under which the defendant promised to pay $2500 to the plaintiff in full satisfaction of all claims, $500 of which was to be paid within thirty days, $1000 out of the first payment made on the sale of the defendant's farm, "Harmony Grove", and the other $1000 out of the second payment. The plaintiff promised to give the defendant the immediate possession of the farm, which he did. The defendant only paid the first instalment of $500. The plaintiff filed a bill in equity asking an enforcement of the defendant's covenant as a charge or lien on the land and praying that the farm be sold to raise the fund to pay off the amount due. The decree of the lower court in favor of the plaintiff was affirmed. Judge Alvey, for the Court, found that the most material question was whether the covenant created an equitable charge or lien. He said:

> "It is objected that the covenant creates only a personal obligation on the defendant, and that, consequently, there is no jurisdiction in a Court of Equity to take cognizance of the case. If this were a mere personal covenant, and nothing more, the objection just stated would certainly be well founded. But that is not our conclusion as to the nature of the covenant. That the covenant does create a personal obligation on the defendant is doubtless true, and one that could be sued on at law; but it does not necessarily follow from that being so, that there may not be also an equitable lien or charge created at the same time. The covenant does not, as may be observed, stipulate in express terms that the land shall be sold and the proceeds of sale applied to the discharge of this particular debt. But we think that is the fair and reasonable implication from the terms employed. In a case

like the present, the question whether there has been a charge created depends in a great measure upon the intention of the contracting parties; and here we think it manifest, as well from the language of the covenant itself as from the circumstances leading to it and under which it was made, that the parties contemplated the sale of the farm, and the proceeds of sale as the fund from which the debt was to be paid." 40 Md. at 196.

In *Union Trust Co. v. Biggs*, 153 Md. 50, 60, 137 Atl. 509 (1927), Judge Parke said, for the Court:

"It is an accepted principle of equity that where, as here, the intention to hold and charge a particular interest or estate as security for the payment of a debt or other obligation is clearly manifested in writing, but frustrated simply through some default of form or in procedure, an equitable lien upon such interest or estate is created, which is enforceable against the property in the hands of not only the original promisor, but as against his heirs, executors, administrators, voluntary assigns, and purchasers or encumbrancers with notice."

*Barnes v. Alexander*, 232 U. S. 117 (1914), involved a contingent fee to lawyers, payable out of the proceeds of the settlement of certain mining suits. The appellees claimed that, through informal business conversations, it was understood they were to have a lien for their fee upon the fund created. The Supreme Court affirmed the judgment of the lower court in their favor. In delivering the opinion of the Court, Mr. Justice Holmes said:

"Obviously the only thing intended or desired was to give the appellees a claim to one-third of the fund received by Barnes if and when he should receive it. It is true that there was in a sense a *res* as to which present words of transfer might have been used. There was a right vested in Barnes unless discharged to try

to earn a fee contingent upon success. But in a speculation of this sort the parties naturally turned their eyes toward the future and aimed at the fruits when they should be gained. They therefore used words of contract rather than of conveyance; but the important thing is not whether they used the present or the future tense but the scope of the contract. In this case it aimed only at the fund. Barnes gave no general promise of reward; he did not even give a promise qualified and measured by success to pay anything out of his own property, referring to the fund simply as the means that would enable him to do it. See *National City Bank v. Hotchkiss,* 231 U. S. 50, 57. He promised only that if, when and as soon as he should receive an identified fund one-third of it should go to the appellees. But he promised that. At the latest, the moment the fund was received the contract attached to it as if made at that moment * * * And it is one of the familiar rules of equity that a contract to convey a specific object even before it is acquired will make the contractor a trustee as soon as he gets a title to the thing." 232 U. S. at 121.

In this case, the agreement between the Employer and Keyworth does not specifically provide for a lien but provides that Keyworth is to repay the Employer the total sums advanced by the Employer on the successful conclusion of the third-party action. In such event, Keyworth authorizes his attorney, Plimack, to issue a check to the Employer for the exact amount so advanced by the Employer. The preamble to the covenants of the agreement contains a recital that Keyworth is receiving the sum of $40 a week from the Employer's Workmen's Compensation carrier, "which sum shall remain the sole property of the employee except for any subrogation rights that the insurance carrier may have."

In our opinion, despite the lack of any express provision creating an equitable lien, it is apparent from all the circumstances, as well as the language of the agreement, that the parties intended that, if Keyworth was successful in his third-party ac-

tion, the Employer was to have an equitable lien against the proceeds for the repayment of the sums which it had advanced, and that the agreement in effect assigned any proceeds of the action as security for the repayment of the advances. The reference to the $40 a week which Keyworth was receiving from the insurance carrier refers to any subrogation rights that the carrier might have; that reference is consistent with and indicates rights in the distribution of a fund. More significant, however, is the authorization by Keyworth to Plimack to issue a check to the Employer for the exact amount advanced by the Employer. As has been observed in the preceding portions of this opinion, Plimack was, at least originally, the Employer's attorney and was employed by Keyworth at the Employer's insistence. It was Plimack who prepared the agreement between the Employer and Keyworth. In the light of these facts, the authorization to Plimack to issue his check to the Employer for the repayment of the advances upon the successful conclusion of the third-party litigation, is, in our opinion, a clear indication that the parties to the agreement looked to the creation of a fund consisting of the proceeds of the verdict or settlement resulting from the third-party action; and that Plimack was to receive the proceeds and was to use them, in part, for the repayment of the advances made by the Employer. There was, in effect, not only a conditional promise by Keyworth to repay the Employer and to transfer property in payment of his debt but an implied contract to assign the fund resulting from the successful prosecution of his third-party action as security for his indebtedness. We think the agreement between the Employer and Keyworth, construed in the light of the facts and circumstances, meant that the source of the monies to be refunded would be the monies actually paid by the third-party defendants, Brown and Fleet Transfer Company, and that these monies were to be held as security for the repayment.

In view of the lien which we have found the Employer was given under the agreement, the lower court acted properly in permitting the Employer's intervention in the pending litigation. Maryland Rule 208; Miller, *Equity Procedure* § 80. Intervention under similar circumstances was approved in *Win-*

*gert v. Gordon,* 66 Md. 106, 6 Atl. 581 (1886). In that case, we said:

> "His claim is based upon the ground that he has acquired by express contract, a lien or charge upon the fund, which is enforceable in equity, and if this be true, we see no objection to the mode he has adopted of enforcing it. We think he has the right to come in by petition and should not be driven to an original bill * * *" 66 Md. at 109.

See also *Barnes v. Alexander, supra.*

It is true that Judge Harris, in his decree and order, merely provided for the retention of the $7200 pending the outcome of the litigation with respect to the alleged indebtedness pending in the Baltimore City Court. Under Maryland Rule 517, the practice theretofore existing of transferring issues of fact arising in an action in equity to a court of law for an advisory verdict by a jury was abolished. However, it is apparent from the records and the briefs that both parties to the lawsuit wished the law court, rather than the equity court, to determine their rights. The Employer filed the lawsuit and asked for a summary judgment, and Keyworth made it clear in the proceedings below that he wished his rights determined by a jury. In view of this implicit consent of the parties, Judge Harris committed no error in providing merely for the retention of the $7200 in the equity proceedings until the final determination of the lawsuit. We, therefore, affirm the decree passed below on October 9, 1964 and so much of the order passed on October 14th as reaffirms the retention of the $7200 in the fund.

In the preceding portions of this opinion, we have affirmed the finding of the court below that Plimack and Israelson were entitled to payment of legal fees out of the fund, but, for the reasons stated, have found that the amount of those fees is subject to further determination. Accordingly, pursuant to Maryland Rules 871 a. and 872, as it appears to this Court that the substantial merits of this portion of the case will not be determined by affirming, reversing or modifying the order, and that the purposes of justice will be advanced by permitting further proceedings in the cause with the introduction of addi-

tional evidence, we remand the case for such further proceedings.

*Decree of October 9, 1964 affirmed and so much of order of court of October 14, 1964 as re-enacts the said decree affirmed; remaining issues of case remanded without affirmance or reversal for further proceedings consistent with the views expressed in this opinion; one-half the costs to be paid by appellant, Keyworth, and the other one-half to be paid by appellees Plimack and Israelson.*