ATLANTIC RICHFIELD COMPANY *v.* CORNELIUS
F. SYBERT, JR. ET AL.

[No. 31, September Term, 1982.]

*Decided February 7, 1983.*

348

The cause was argued before MURPHY, C. J., and SMITH, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*John F. Wilson, III* and *Charles M. Preston* for appellant.

*Thomas A. Garland* for appellees.

DAVIDSON, J., delivered the opinion of the Court.

This case presents three questions. The first question concerns the circumstances under which a contract between an attorney and a client for the payment of compensation may be enforced by an attorney who simultaneously represents another client with adverse interests. The second question concerns the circumstances under which an attorney, who is not licensed as a real estate broker, may recover a commission on the sale of real estate, notwithstanding the prohibitions contained in Maryland Code (1957, 1979 Repl.Vol.), Art. 56, § 217 (a) and § 228. The third question concerns the burden of proof applicable when a trial court determines the existence and terms of a contract allegedly made between an attorney and a client at a time when the attorney/client relationship existed.

The respondents, Cornelius F. Sybert, Jr. (Sybert) and Lewis S. Nippard (Nippard), are attorneys and partners in the law firm of Sybert, Sybert, and Nippard (law firm). In 1972, the petitioner, Atlantic Richfield Company (ARCO), a Pennsylvania corporation, otherwise represented by counsel, retained Sybert for the purpose of obtaining a special exception on property located in Howard County (Schultz property) to be used as a pipeline terminal facility. Sybert's main contact at ARCO was George Tracy (Tracy), who was then ARCO's Real Estate Manager, Special Projects. Tracy was then close to 65 years old and had been employed at ARCO for close to 25 years, during which time he had been actively engaged in the acquisition and sale of properties for ARCO.

Although neither Sybert, Nippard, nor any other member of the law firm was a licensed real estate broker, in September 1974, Citadel Corporation (Citadel), otherwise represented by counsel, retained Nippard for the purpose of locating a suitable property and obtaining the necessary zoning clearances for the construction of a petroleum storage facility. At that time, Sybert was still representing ARCO in the then ongoing proceedings to obtain a special exception on the Schultz property that was ultimately obtained in 1975. *See Gowl v. Atlantic Richfield Co.,* 27 Md.App. 410, 341 A.2d 832 (1975).

In the fall of 1974, Tracy informed Sybert that ARCO was having second thoughts about developing the Schultz property. Sybert, aware of Citadel's interest in purchasing such a property, agreed with Nippard that he would contact Tracy to learn if ARCO would be interested in selling the Schultz property. Sybert informed Tracy that the law firm had another client who might purchase the Schultz property, and Tracy indicated that he was interested in pursuing the matter. Nippard then informed Roger Keohneke (Keohneke), a vice president of Citadel, that his law firm represented another client who might have a suitable piece of property for sale.

While the appeal of ARCO's requested special exception was still pending, Sybert and Nippard arranged for a meeting between Tracy and Keohneke to take place on 16 October 1974 at the law firm's offices. Before that meeting, Sybert and Nippard met with Tracy. At that time, Tracy indicated that in addition to the Schultz property, ARCO might be interested in selling two other properties, its Key Highway Terminal, located in Baltimore, and its Belvoir Terminal, located in Virginia. Additionally, Tracy, Sybert, and Nippard agreed that ARCO would compensate Sybert and Nippard in the event of a sale of its properties to the law firm's other client, Citadel.

Subsequently, there was a meeting between Sybert, Nippard, Tracy, and Keohneke. Keohneke expressed an interest in purchasing one of the three properties. At that time, Tracy and Keohneke were aware that ARCO and Citadel were each represented by members of the same law firm. However, no explanation of the implication or possible effect of such common representation was offered. Moreover, no explicit consent to such dual representation was given. Commissions were not discussed at the meeting.

On 29 October 1974, Tracy wrote to Sybert that ARCO would not sell the Schultz property but might sell the Key Highway or Belvoir terminals. Tracy indicated that if Citadel was interested in purchasing either property, it should contact the manager of ARCO's Commercial Properties Department. After Sybert gave this information to Nippard, Nippard called the manager, who sent him a brochure describing the two properties. Again, commissions were not discussed. On 24 January 1975, Nippard forwarded the brochure to Keohneke. Thereafter, neither Sybert nor Nippard had any contact with Citadel or ARCO concerning the sale of any of these properties. Rather, Alan O. Keiler, counsel for Citadel, communicated directly with the manager of ARCO's Commercial Properties Department, and they negotiated for the sale of the Belvoir Terminal.

On 30 May 1975, ARCO sold the Belvoir Terminal to Belvoir Terminal Corporation, an entity formed by the prin-

cipals of Citadel, for $3,125,000. Upon learning of the sale, Sybert repeatedly demanded a commission from ARCO. The demands were rejected.

On 20 August 1976, Sybert and Nippard filed a declaration in the Circuit Court for Howard County alleging that ARCO owed them a commission on the sale of the Belvoir Terminal. On 4 November 1977, the case was removed to the Circuit Court for Carroll County.

On 20 February 1980, ARCO filed a motion to dismiss. That motion was premised in part on an allegation that, because Sybert and Nippard were not licensed as real estate brokers, they were prohibited from recovering a commission on the sale. On 21 February 1980, the trial court denied that motion.

At a bench trial, most of the relevant facts were undisputed. Tracy, Sybert, and Nippard each testified, in essence, that Tracy had agreed that ARCO would compensate Sybert and Nippard in the event of a sale of ARCO's properties to Citadel. The major area of disagreement centered upon the nature and amount of the compensation to be paid.

According to Tracy, he never agreed to pay Sybert or Nippard a commission for any possible sale of ARCO's properties. However, he failed to offer any affirmative evidence to show the nature and amount of the compensation that he had agreed to pay. Indeed, according to Tracy:

> "My only recollection of any discussion of compensation was to the effect that, since Mr. Sybert was our attorney — was the company's attorney in another matter, and the matters were sort of interrelated — that, *if anything came of it, that something would have to be worked out about how to be compensated."* (Emphasis added.)

According to Sybert and Nippard, Tracy had agreed that ARCO would pay a "usual" or "normal" commission in the event that a sale of the Schultz property or any other property was arranged as a result of the meeting. According to

one expert in the field of real estate, ten percent of the purchase price constituted a usual or normal commission. According to another such expert, there was no "usual" or "normal" commission for the sale of improved industrial property. However, there was a "fair and reasonable" commission that would be "six percent of the first $500,000 of the sale price and three percent of the balance."

On 1 April 1981, the trial court, in a written opinion in which the standard of proof applied was not articulated, determined that Tracy had real or apparent authority to bind ARCO to a contract to pay a commission to Sybert and Nippard; that Tracy agreed that ARCO would pay a usual commission in the event of a sale; that a usual commission was ten percent of the sale price; and that a valid contract had been created. Moreover, after determining that Tracy was informed of the law firm's dual role as attorneys for both ARCO and Citadel, the trial court determined that ARCO's agreement to pay Sybert and Nippard a commission was enforceable. On 6 April 1981, the trial court entered a final judgment in favor of Sybert and Nippard.

ARCO appealed to the Court of Special Appeals. Although the trial court had not articulated the standard of proof it had applied, the Court of Special Appeals concluded, among other things, that in the absence of an allegation of fraud or undue influence, proof by a preponderance of the evidence, rather than by clear and convincing evidence, was the appropriate standard to be applied in determining the existence of a contract allegedly made between an attorney and a client at a time when the attorney/client relationship existed. The Court of Special Appeals affirmed the judgment of the trial court. *Atlantic Richfield Co. v. Sybert,* 51 Md.App. 74, 441 A.2d 1079 (1982).

ARCO filed a petition for a writ of certiorari that we granted. We shall affirm the judgment of the Court of Special Appeals. However, as we shall later explain, the record in this case makes it unnecessary to determine the applicable standard of proof.

## I

ARCO contends that its agreement to pay Sybert and Nippard compensation was null and void because of their alleged conflict of interests arising from their simultaneous representation of clients with adverse interests. It points out that Sybert and Nippard, members of the same law firm, simultaneously represented ARCO and Citadel, the seller and buyer, in a potential real estate transaction. It asserts that Sybert and Nippard failed to disclose fully "the potential pitfalls of their dual representation," and also "failed to obtain any informed consent to such dual representation." Because we do not agree with these assertions, we find that the compensation agreement was enforceable.

This Court has repeatedly recognized that ordinarily an attorney representing a client may not represent interests adverse to those of the client. *See, e.g., Wooddy v. Mudd,* 258 Md. 234, 246, 250, 265 A.2d 458, 464, 466 (1970); *Keyworth v. Israelson,* 240 Md. 289, 302, 214 A.2d 168, 175 (1965); *Rippon v. Mercantile-Safe Deposit & Trust Co.,* 213 Md. 215, 223, 131 A.2d 695, 698 (1957); *see also, e.g., Sinclair v. State,* 278 Md. 243, 253-54, 363 A.2d 468, 474-75 (1976); *see also* DR 5-101(A); DR 5-103(A); DR 5-105(A), (B) & (D). Thus, in *Derlin v. Derlin,* 142 Md. 352, 121 A. 27 (1923), with respect to an attorney's representation of clients with adverse interests, this Court said:

> " '*An attorney at law* who has once been retained and received the confidence of a client, *is* thereafter *disqualified from acting for any other person adversely interested in the same general matter, however slight such adverse interest may be.* Nor does it matter that the intention and motive of the attorney are honest. *This rule is a rigid one,* and designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties, or be led to an

attempt to reconcile conflicting interests, rather than to enforce to their full extent the rights of the interest which he should alone represent.' " *Derlin,* 142 Md. at 364, 121 A. at 31 (emphasis added).

Notwithstanding the apparent rigidity of this rule, this Court has determined that the consequences that flow from an attorney's simultaneous representation of adverse interests vary depending upon the facts and circumstances of each case. Thus, this Court has repeatedly held that ordinarily a transaction will be set aside if it is shown that a party to the transaction was represented by an attorney who simultaneously represented adverse interests, whether the adverse interests were those of the attorney or of other clients, and that the attorney exercised undue influence or perpetrated a fraud, or that the transaction was otherwise unfair. *E.g., Iula v. Grampa,* 257 Md. 370, 384, 263 A.2d 548, 555 (1970) (other client's adverse interest); *Hughes v. McDaniel,* 202 Md. 626, 633-35, 98 A.2d 1, 4-5 (1953) (attorney's adverse personal interest); *Cook v. Hollyday,* 185 Md. 656, 668-69, 671, 45 A.2d 761, 766, 768 (1946) (attorney's adverse personal interest); *Baker v. Otto,* 180 Md. 53, 58, 22 A.2d 924, 927 (1941) (attorney's adverse personal interest); *Derlin,* 142 Md. at 364, 121 A. at 31 (attorney's relative's adverse interest); *Merryman v. Euler,* 59 Md. 588, 590-91 (1883) (attorney's adverse personal interest); *see Crest Inv. Trust, Inc. v. Comstock,* 23 Md.App. 280, 302, 327 A.2d 891, 907 (1974) (other client's adverse interest). However, while reaching that result, this Court explicitly acknowledged that, if after full disclosure of the attorney's conflict of interest, a client had voluntarily and knowingly consented to enter into a transaction, such a transaction would not be set aside.

Thus, in *Baker v. Otto,* 180 Md. 53, 22 A.2d 924 (1941), although this Court set aside a transaction because a party was represented by an attorney who had an adverse personal interest in the transaction, this Court said:

" 'No part of the jurisdiction of the court is more useful, it has been said, than that which it exercises in watching and controlling transactions between parties standing in a relation of confidence to each other. \*\*\* The broad principle \*\*\* is that wherever there exists such a confidence \*\*\* the court will not allow any transaction between the parties to stand, *unless there has been the fullest and fairest explanation and communication of every particular* resting in the breast of the one who seeks to establish a contract with the person so trusting him.' " *Baker,* 180 Md. at 56, 22 A.2d at 926 (emphasis added).

Similarly, in *Keyworth v. Israelson,* 240 Md. 289, 214 A.2d 168 (1965), although this Court set aside a fee agreement between an attorney and a client because the attorney had simultaneously represented another client with adverse interests, this Court said:

"It is also true, however, that even when a transaction between an attorney and his client is questioned, if the attorney can show that *the client entered into the relationship voluntarily, deliberately and advisedly, knowing its nature and effect,* and that there was no concealment of any kind or undue means used to obtain the client's consent, *the transaction will be sustained."* *Keyworth,* 240 Md. at 302-03, 214 A.2d at 175 (emphasis added).

The same principle has been articulated by the Court of Special Appeals. Thus, in *Crest Investment Trust, Inc. v. Comstock,* 23 Md.App. 280, 327 A.2d 891 (1974), although that Court set aside a contract because the complaining party had been represented by an attorney who simultaneously represented the other party to the contract, that Court said:

"Furthermore, if dual representation does occur, fidelity to the Code of Professional Responsibility

and prudent concern for legitimate self-interest against possible liability dictate that *full disclosure be made of the possible dangers involved* and that the legal representation be fundamentally fair to both sides. The requirements of full disclosure were spelled out in *In re Kamp,* [40 N.J. 588, 595-96, 194 A.2d 236, 240 (1963)] in terms not inappropriate to the instant case:

> 'Full disclosure requires the attorney not only to inform the prospective client of the attorney's relationship to the seller, *but also to explain in detail the pitfalls that may arise in the course of the transaction* which would make it desirable that the buyer have independent counsel. *The full significance of the representation of conflicting interests should be disclosed to the client so that he may make an intelligent decision before giving his consent.* If the attorney cannot properly represent the buyer in all aspects of the transaction because of his relationship to the seller, full disclosure requires that he inform the buyer of the limited scope of his intended representation of the buyer's interests and point out the advantages of the buyer's retaining independent counsel.' "

*Crest Investment Trust, Inc.,* 23 Md.App. at 303, 327 A.2d at 905 (some emphasis in original) (some emphasis deleted) (some emphasis added).

Indeed, this Court has held that generally a transaction in which a party is represented by an attorney who simultaneously represents adverse interests will not be set aside if the client, after full disclosure by the attorney, voluntarily and knowingly consents to enter into the transaction. *E.g., Shoreham Developers, Inc. v. Statland,* 260 Md. 689, 691-92, 273 A.2d 152, 153 (1971) (attorney's adverse personal interest); *Rippon,* 213 Md. at 223, 131 A.2d at 699 (other client's adverse interest); *McLean v. Maloy,* 136 Md. 467, 512-13,

517, 111 A. 91, 107-08, 109 (1920) (attorney's adverse personal interest); *see Roman v. Mali,* 42 Md. 513, 558-59 (1875) (attorney's adverse personal interest). More particularly, in *McLean v. Maloy,* 136 Md. 467, 111 A. 91 (1920), this Court refused to set aside a transaction in which a party was represented by an attorney who had an adverse personal interest in the transaction. There, this Court said:

" '[T]he rule [governing transactions between client and attorney] does not go the length of absolutely avoiding transactions between parties standing in that relation. The attorney is under no actual incapacity to deal with or purchase from his client. All that can be required is, that there has been no abuse of the confidence reposed; no imposition or undue influence practiced, nor any unconscionable advantage taken by the attorney of the client. When a transaction between parties occupying such relation to each other is brought in question, the onus of the case is cast upon the attorney of showing that nothing has happened in the course of the dealing which might not have happened had no such connection subsisted, and that the transaction has been fair in all respects. *If the Court be satisfied that the party holding the relation of client performed the act or entered into the transaction voluntarily, deliberately and advisedly, knowing its nature and effect, and that no concealment or undue means were used to obtain his consent to what was done, the transaction will be maintained. . . .' " McLean,* 136 Md. at 513, 111 A. at 108 (emphasis added).

This principle is consonant with the principles expressed in the Code of Professional Responsibility adopted by this Court.[1]

---

1. Canon 5 states:

"A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client"

Courts in some other jurisdictions agree that a transaction, in which a party is represented by an attorney who simultaneously represents adverse interests, will not be set aside if the client, after full disclosure by the attorney, consents to enter into the transaction. *See, e.g., Beal v. Mars Larsen Ranch Corp.,* 99 Idaho 662, 668, 586 P.2d 1378, 1384 (1978); *Rolfstad, Winkjer, Suess, McKennett & Kaiser v. Hanson,* 221 N.W.2d 734, 737-38 (N.D. 1974); *Lessing v. Gibbons,* 6 Cal.App.2d 598, 605-06, 45 P.2d 258, 261 (1935); *West v. Mohr,* 194 Ill.App. 496, 499-500 (1915). *But see, e.g., Strong v. International Bldg., Loan & Inv. Union,* 183 Ill. 97, 101-04, 55 N.E. 675, 676-77 (1899). Illustrative is the case of *West v. Mohr,* 194 Ill.App. 496 (1915). There, as here, a party who was represented in a transaction by an attorney who simultaneously represented another party with adverse interests, refused to pay the attorney's fee. In enforcing the fee agreement, the Illinois Court of Appeals, First District, said:

DR 5-101(A) states:

"*Except with the consent of his client after full disclosure,* a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests." (Emphasis added.)

DR 5-105(A) states:

"A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C)."

DR 5-105(B) states:

"A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105(C)."

DR 5-105(C) states:

"In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and *if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.*" (Emphasis added.)

"[The attorney], it is true, represented two parties whose interests were conflicting. Mrs. Geary desired to get a comparatively large sum of money from Mohr, and Mohr desired to be relieved from her demands by paying her a comparatively small sum; *but no conflicting duties were imposed on [the attorney]. His chief duty was to furnish a channel of communication between the parties. He disclosed to each party his relation to the other and acted with the consent of both.*

"We see no impropriety or inconsistency in his acting for both parties under the circumstances, nor any just ground for the refusal of [the client] to fulfill his promise to pay him for his services, and the judgment is affirmed." *West,* 194 Ill.App. at 499-500 (emphasis added).

In the instant case, we shall apply the principle that ordinarily a transaction in which a party is represented by an attorney who simultaneously represents adverse interests will not be set aside if the client, after full disclosure by the attorney, voluntarily and knowingly consents to the transaction. Here, the record shows that Sybert and Nippard were members of the same law firm. In 1974, Sybert represented ARCO, a corporation otherwise represented by counsel, in a proceeding to obtain a special exception. At the same time, Nippard represented Citadel, a corporation otherwise represented by counsel, for the purpose of locating a property, and obtaining necessary zoning. Tracy, then aged 65, with 25 years of experience in the acquisition and sale of real estate for ARCO, was ARCO's Real Estate Manager, Special Projects.

Further, the record shows that in the fall of 1974, Sybert told Tracy that the law firm had another client who might purchase ARCO's property, thus fully disclosing the fact that the law firm represented another client with potentially adverse interests. With full knowledge of this dual representation, Tracy agreed that he would attend a meeting at which Sybert and Nippard would introduce him to the law

firm's other client and that ARCO would compensate Sybert and Nippard in the event of a sale of one of its properties to that other client. Subsequently, with full knowledge of the law firm's dual representation, Tracy attended the meeting at which he was introduced to Keohneke, Citadel's vice president, who expressed an interest in purchasing ARCO's property. Thereafter, Tracy informed Sybert that if Citadel was interested in purchasing either property, it should contact the manager of ARCO's Commercial Properties Department. After forwarding a brochure describing the two properties to Citadel, neither Sybert nor Nippard had any further contact with Citadel or ARCO concerning the sale of any of ARCO's properties. However, a sale was negotiated and consummated by ARCO's manager and Alan O. Keiler, counsel for Citadel.

This record establishes that Sybert and Nippard, members of the same law firm, simultaneously represented clients with potentially adverse interests in the same transaction. However, their function, with respect to the negotiation and consummation of the sale of ARCO's property, was extremely limited. Their activities consisted of arranging one meeting at which the parties were introduced and mailing a brochure describing the property to the potential buyer. In essence, the law firm's participation consisted solely of establishing a channel of communication between their two clients. The sale itself was negotiated and consummated by two corporate clients, each otherwise represented by counsel.

Given Sybert's and Nippard's limited role, they were not required to perform any conflicting duties. Moreover, given their limited role, no pitfalls could have arisen from their dual representation that would have required explanation or an admonition to obtain independent counsel. Consequently, the fact that, at all relevant times, Tracy had been fully informed of the law firm's dual representation constituted full disclosure. Finally, the fact that Tracy, after full disclosure of Sybert's and Nippard's dual representation, agreed to compensate Sybert and Nippard in the event of a sale of

ARCO's property to Citadel, establishes that ARCO voluntarily and knowingly consented to compensate Sybert and Nippard.

Under the facts and circumstances of this case, the transaction, in which ARCO agreed to compensate Sybert and Nippard, will not be set aside. The attorneys are entitled to recover, despite their simultaneous representation of clients with potentially adverse interests. Accordingly, ARCO's agreement for the payment of compensation will be enforced.

## II

ARCO next contends that the law firm was prohibited by Md. Code (1957, 1979 Repl.Vol.), Art. 56, § 228 [2] from recovering on a contract for a commission on the sale of real estate because no member of the law firm was licensed as a real estate broker or salesman as required by Md. Code (1957, 1979 Repl.Vol.), Art. 56, § 217 (a).[3] We do not agree.

The cardinal rule of statutory construction is to ascertain the actual intent of the Legislature. The primary source

---

**2.** Art. 56, § 228 provides:

"No action or suit shall be instituted, *nor recovery therein be had,* in any court of this State by any person, copartnership, association, or corporation *for compensation for any act done* or service rendered, *the doing or rendering of which is prohibited* under the provisions of this subtitle *to other than licensed real estate brokers* and real estate salesmen *unless such person, copartnership, association or corporation was duly licensed hereunder as real estate broker* or real estate salesman prior to the time of offering to perform any such act or service or procuring any promise or contract for the payment of compensation for any such contemplated act or service." (Emphasis added.)

**3.** Art. 56, § 217 (a) provides:

"From and after June 1, 1939, *it shall be unlawful for any person, copartnership,* association, or corporation to engage in or carry on the business of or *act in the capacity of a real estate broker* or a real estate salesman within this State *without first obtaining a license* as herein provided; provided that any licensee who has applied for the renewal of such license and paid the required fee prior to the expiration of his annual license shall be deemed to be duly licensed during any period of delay by the Commission in issuing the renewal certificate." (Emphasis added.)

from which to determine the intention of the Legislature is the language of the statute itself. *Haskell v. Carey,* 294 Md. 550, 556, 451 A.2d 658, 662 (1982). In determining the meaning of a particular provision or section, even where its language appears to be clear and unambiguous, it is necessary to examine that provision or section in its context. *Comptroller of the Treasury v. John C. Louis Co.,* 285 Md. 527, 538, 404 A.2d 1045, 1052 (1979).

The statutory scheme embodied in Art. 56, §§ 212 through 232A, the Real Estate Brokers' Subtitle, is clear. Section 217 establishes that it is unlawful to act in the capacity of a real estate broker without obtaining a license. Section 228 establishes that an unlicensed person acting in the capacity of a real estate broker cannot recover a commission for any act required to be performed by a licensed real estate broker. Section 212 (a) defines a real estate broker as including, among other things, a person who charges a commission for engaging in certain acts associated with the sale and use of real estate.[4]

Section 212 (f), however, establishes certain exceptions to the definition of a real estate broker. More particularly, that section provides in pertinent part:

---

**4.** § 212 (a) provides:

" 'Real estate broker' shall mean any person, association, copartnership or corporation foreign or domestic, who for another and for a fee, commission or any other valuable consideration sells, purchases, exchanges, leases, rents or collects rent for the use of real estate or who attempts or who offers by verbal solicitation, advertisement or otherwise to perform any such function, or who aids, attempts or offers to aid, for a fee, any person in locating or obtaining for purchase or lease any residential real estate, or who is regularly engaged in the business of dealing and trading in real estate or leases and options thereon, or who engages in the business of charging an advance fee or contracting for collection of a fee in connection with any contract whereby he undertakes primarily to promote the sale of real estate through its listing in a publication issued primarily for such purpose, or for referral of information concerning such real estate to brokers, or both, or who is engaged in the business of subdividing and selling land in building lots or sites, whether such real estate is located in this or any other state or the District of Columbia."

"(f) Exceptions. — The terms 'real estate broker' and 'real estate salesman' do not include:

. . .

"(6) *Attorneys at law* who are not regularly engaged in the real estate business and who do not hold themselves out by sign, advertisement or otherwise as offering to the general public the services authorized by this subtitle to be performed by real estate brokers. . . ." (Emphasis added.)

Thus, § 212 (f) (6) establishes that an attorney who is not regularly engaged in the real estate business and who does not offer to provide real estate services to the general public, may, for a commission, perform certain acts associated with the sale and use of real estate without being licensed as a real estate broker. Accordingly, such an attorney, who is not licensed as a real estate broker, and who engages in such acts, does not violate § 217 (a). Therefore, the prohibition against recovery contained in § 228, generally applicable to unlicensed persons who act in the capacity of a real estate broker, is inapplicable to such an attorney.

Here the record shows that Sybert and Nippard, attorneys who were not licensed as real estate brokers, offered to introduce ARCO to a potential purchaser of its properties in exchange for a commission in the event of a sale. Moreover, the record shows that Sybert and Nippard did in fact introduce ARCO to a potential purchaser and that a sale ultimately was consummated without any additional participation by Sybert or Nippard. While there was evidence to show that Sybert and Nippard were regularly engaged in the practice of law relating to real estate, there was no evidence to show that they were regularly engaged in the real estate business or that they publicly offered to perform acts authorized to be performed by a real estate broker. Under these circumstances, Sybert and Nippard were not real estate brokers within the definition of § 212 and did not have to be

licensed as real estate brokers under § 217 (a). Consequently, they were not prohibited by § 228 from recovering the agreed upon commission when the potential purchaser they had introduced to ARCO eventually bought the property.

## III

Relying upon *Cook v. Hollyday,* 185 Md. 656, 672, 45 A.2d 761, 768 (1946) and *Baker v. Otto,* 180 Md. 53, 55-56, 22 A.2d 924, 926 (1941), ARCO finally contends that the trial court applied an erroneous standard of proof in determining that Sybert, Nippard, and ARCO had entered into an agreement for the payment of a commission at a time when an attorney/client relationship existed between them. It maintains that in order for an attorney to establish the existence and terms of an alleged agreement with a client, the applicable standard of proof is that of clear and convincing evidence, rather than a preponderance of the evidence. It asserts that the more rigorous standard is appropriate because the confidential and fiduciary relationship enables an attorney to take unfair advantage of a client. It concludes that the evidence presented by Sybert and Nippard was insufficient to satisfy that standard.

Here there was evidence presented to show that Tracy was "Real Estate Manager, Special Projects" at ARCO; that Sybert informed Tracy that another of his law firm's clients might be interested in purchasing the Schultz property and that Tracy indicated that he was interested in pursuing such a sale; that Tracy subsequently informed Sybert and Nippard that ARCO might be interested in selling two other properties; that Sybert and Nippard offered to introduce ARCO to the client who was a potential purchaser of ARCO's properties; that Tracy agreed that in the event of a sale of any of the properties to that client, Sybert and Nippard would be compensated and that the compensation would consist of a "usual" or "normal" commission; that ten percent of the sale price constituted a usual or normal commission;

that thereafter Sybert and Nippard introduced Tracy to their client, Citadel; that Nippard obtained a brochure from ARCO that he forwarded to Citadel; that thereafter neither Sybert nor Nippard had any contact with ARCO or Citadel concerning the sale of any property; and that ultimately a sale of one of ARCO's properties to Citadel was consummated.

The record here shows that there was direct, unequivocal, and, for the most part, undisputed evidence presented on each of the elements necessary to establish the existence of an agreement on the part of ARCO to pay Sybert and Nippard a ten percent commission on the sale of its property. The trial court was not required to draw inferences from circumstantial, indirect, or equivocal evidence in order to determine the requisite facts. Under these circumstances, the evidence presented was more than sufficient to support the trial court's findings. Indeed, the evidence was clear and convincing. Accordingly, even if we assume that the applicable standard of proof here was clear and convincing evidence, we find that that standard has been satisfied. Therefore, based upon the record before us, we need not determine whether the less stringent preponderance of the evidence standard was applicable.

> *Judgment of the Court of Special Appeals affirmed.*
> *Costs to be paid by petitioner.*